Page 1

VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND
JOHN MARSHALL COURTS BUILDING


BARBARA ANNE ANDERSON,        ) CASE NO. 760CL06006790-00
                              )
                              )
            Plaintiff,        )
                              )
vs.                           )
                              )
ALFA LAVAL, INC., et al.,     )
                              )
            Defendant.        )
_____)



DEPOSITION

OF

BARBARA ANNE ANDERSON

VOLUME I


Taken by Defendant General Electric
Morrisville, North Carolina
Wednesday, January 10, 2007



Reported by:  Ranae McDermott, RMR, CRR



DEFENDANT'S
EXHIBIT

Page 2

```
 1          A P P E A R A N C E S
 2  COUNSEL FOR PLAINTIFF:
 3       ASHLEY C. FISHER, ESQ.
         MARY H. KEYES, ESQ.
 4       Waters & Kraus, LLP
         3219 McKinney Avenue
 5       Dallas, TX 75204
         Telephone: (214) 357-6244
 6       Facsimile: (214) 357-7252
         afisher@waterskraus.com
 7       mkeyes@waterskraus.com
 8  COUNSEL FOR DEFENDANT GENERAL ELECTRIC:
 9       DAVID M. STURM, ESQ.
         LeClair Ryan, PC
10       Riverfront Plaza, East Tower
         951 East Byrd Street
11       Richmond, VA 23218-2499
         Telephone: (804) 916-7170
12       Facsimile: (804) 916-7270
         david.sturm@leclairryan.com
13
      COUNSEL FOR DEFENDANT OWENS-ILLINOIS, INC.:
14
         RANDOLPH L. BURNS, ESQ.
15       The Burns Law Firm, PC
         PO Box 1197
16       Port Aransas, TX 78373
         Telephone: (800) 531-8720
17       Facsimile: (888) 749-3330
         rodonnell@vanblk.com
18
      COUNSEL FOR THE DEFENDANT FOSTER WHEELER ENERGY
19  CORPORATION:
20       ROBERT A. ZIOGAS, ESQ.
         Glenn Feldmann Darby & Goodlatte
21       210 1st Street, S.W.
         Suite 200
22       Roanoke, VA  24001
         Telephone: (540) 224-8005
23       Facsimile: (540) 224-8050
         rziogas@gfdg.com
24
25
```

Page 3

```
 1  APPEARANCES CONTINUED:
 2  COUNSEL FOR DEFENDANT UNION CARBIDE:
 2       M. TODD RAINSFORD, ESQ.
         Pierce, Herns, Sloan & McLeod, LLC
 4       The Blake House
         321 East Bay Street
 5       Charleston, SC  29413
         Telephone: (843) 722-7733
 6       Facsimile: (843) 722-7732
         toddrainsford@phsm.net
 7
      COUNSEL FOR DEFENDANT TH AGRICULTURE & NUTRITION, LLC:
 8
         ERIC D. COOK, ESQ.
 9       Willcox & Savage
         One Commercial Place
10       Suite 1800
         Norfolk, VA  23510
11       Telephone: (757) 628-5661
         Facsimile: (757) 628-5566
12       ecook@wilsav.com
13  COUNSEL FOR THE DEFENDANT GEORGIA-PACIFIC CORPORATION:
14       JEFFREY S. PORETZ, ESQ.
         Miles & Stockbridge, P.C.
15       1751 Pinnacle Drive
         Suite 500
16       McLean, VA  22102-3833
         Telephone: (703) 903-9000
17       Facsimile: (703) 610-8686
         jporetz@milesstockbridge.com
18
      COUNSEL FOR DEFENDANTS RPM INTERNATIONAL, INC., RPM,
19  INC., BONDEX INTERNATIONAL, INC., IMO INDUSTRIES:
20       JOSHUA H. BENNETT, ESQ.
         Bennett & Guthrie, PLLC
21       1560 Westbrook Plaza Drive
         Winston-Salem, NC 27103
22       Telephone: (336) 765-3121
         Facsimile: (336) 765-8622
23       jbennett@bennett-guthrie.com
24
25
```

Page 4

```
 1  APPEARANCES CONTINUED:
 2  COUNSEL FOR DEFENDANT GARLOCK, INC.:
 3       GAUHAR R. NASEEM, ESQ.
         Duane, Hauck & Gnapp, P.C.
 4       10 East Franklin Street
         Richmond, VA  23219
 5       Telephone: (804) 644-7400
         Facsimile: (804) 649-8329
 6       gnaseem@duanehauck.com
 7  COUNSEL FOR DEFENDANT CRANE CO.:
 8       JAMES C. McCAA, III, ESQ.
         Taylor and Walker, P.C.
 9       1300 First Virginia Tower
         555 Main Street
10       Norfolk, VA  23510
         Telephone: (757) 625-7300
11       Facsimile: (757) 625-1504
         jmccaa@taylorwalkerlaw.com
12
      COUNSEL FOR DEFENDANT ALFA LAVAL, INC.:
13
         JOSHUA L. ELLIS, ESQ.
14       Nexsen Pruet
         205 King Street
15       Suite 400
         Charleston, SC  29402
16       Telephone: (843) 579-7811
         Facsimile: (843) 720-1777
17       jellis@nexsenpruet.com
18
19       *****
20
21
22
23
24
25
```

Page 5

```
 1            C O N T E N T S
 2                         PAGE
 3  DIRECT EXAMINATION BY MR. STURM          6
 4  CROSS-EXAMINATION BY MR. ZIOGAS        137
 5  CROSS-EXAMINATION BY MR. PORETZ        145
 6  CROSS-EXAMINATION BY MR. NASEEM        173
 7  CROSS-EXAMINATION BY MR. COOK          174
 8  CROSS-EXAMINATION BY MR. BENNETT       176
 9  CROSS-EXAMINATION BY MR. RAINSFORD     182
10
11            E X H I B I T S
12  EXHIBIT       DESCRIPTION       PAGE
13    1       Work history sheets      92
14
15
16           *****
17
18
19
20
21
22
23
24
25
```

Page 6

1      On January 10, 2007, commencing at
2  10:02 a.m., the deposition of BARBARA ANNE ANDERSON,
3  was taken pursuant to the Rules of the Supreme Court of
4  Virginia on behalf of Defendant General Electric at the
5  Holiday Garden Inn, 1500 RDU Center Drive, Morrisville,
6  North Carolina.
7          P R O C E E D I N G S
8  Whereupon, BARBARA ANNE ANDERSON, having been duly
9  sworn, was examined and testified as follows:
10          DIRECT EXAMINATION
11  BY MR. STURM:
12    Q.  Could you please state your full name for
13  the record, please?
14    A.  Barbara Anne Anderson.
15    Q.  Okay.  My name is David Sturm.
16          MR. STURM:  Oh, for the record, the
17  parties have stipulated that objections -- all
18  objections, except as to the form of the question,
19  are going to be reserved.  Also, the -- we've agreed
20  that one objection is good for all that are in
21  attendance at the deposition.
22          Anything else, Mary?
23          MS. KEYES:  No.  That's -- that's
24  fine.  Thanks.
25    Q.  Okay.  Ms. Anderson, what's the name of the

Page 7

1  place where your father worked when you were growing
2  up as a child?
3    A.  Portsmouth Naval Shipyard --
4    Q.  Okay.
5    A.  -- is the location I remember.  And I
6  remember him taking the shipyard bus.
7    Q.  Okay.  Now, was it known to you as the
8  Portsmouth Shipyard or was it known to you as the
9  Norfolk Shipyard?  How was it known to you?
10    A.  I really don't -- don't recall that.
11    Q.  Okay.  And that's okay.  During the course
12  of the deposition, the lawyers here are going to be
13  asking you questions.  And there may be some
14  questions that you don't know the answer to, and it's
15  perfectly acceptable for you to say you don't recall
16  or you don't remember when -- when that's the case.
17  Okay?
18    A.  Um-hum.
19    Q.  Also, the court reporter is going to be
20  taking down your testimony and she's going to respond
21  to your verbal answers.  She will not be able to take
22  down nods of the head or any answers where you
23  haven't responded audibly.
24      Also, if you respond uh-huh or huh-uh,
25  those types of answers, it's difficult for the court

Page 8

1  reporter to distinguish between those two.  So if you
2  could try to respond yes or no when it's appropriate,
3  that would also be helpful.
4    A.  Okay.
5    Q.  Did you ever have occasion to visit your
6  father at the shipyard?
7    A.  No.
8    Q.  Okay.  So is it a fair statement that you
9  never observed any work that your father performed at
10  the shipyard?
11    A.  That's correct.
12    Q.  Okay.  Do you -- tell me what you know
13  about the work that your father did at the shipyard.
14    A.  I recall that he was a pipe coverer and
15  insulator.  As far as the work he did, I wasn't
16  there, so I can't tell you that.  I recall him coming
17  home from work and the condition of his clothes and
18  things that he came home with.
19    Q.  Okay.  Okay.  And -- and we'll -- we'll get
20  to that in just a few minutes.  But with respect to
21  the actual work that your father did, you really
22  don't have any knowledge of the details of that work;
23  is that correct?
24          MS. FISHER:  Objection.  Form.
25    A.  No.

Page 9

1          MS. FISHER:  You can answer.
2    Q.  Okay.  Now, Ms. Anderson in some of
3  these -- some of these cases, folks say they --
4  they -- they don't know how they were exposed to
5  asbestos.
6      And my question for you is:  Before you met
7  with your attorneys in this case, what was your
8  understanding of how you were exposed to asbestos?
9    A.  I don't know how I was exposed.
10    Q.  Okay.  Have you ever provided a deposition
11  testimony before, a deposition?
12    A.  No.
13    Q.  Okay.  If -- if I ask you any questions or
14  any of the lawyers here ask you any questions that
15  you don't understand, will -- will you let us know?
16    A.  Yes.
17    Q.  So is it fair for -- is it then fair for us
18  to assume that if you respond to a question without
19  telling us that you didn't understand it that you
20  did, in fact, understand the question?
21          MS. FISHER:  Objection.  Form, asked
22  and answered.
23    A.  Yes.
24    Q.  Okay.  The other thing is when -- it's sort
25  of a deposition is a question-and-answer type of

Page 10

1  situation and we should try to avoid speaking at the
2  same time because the court reporter, it's very
3  difficult for her to take down two people speaking at
4  the same time, also. Okay?
5      A. Okay.
6      Q. There may be times where your lawyers
7  object and, certainly, you want to listen to that
8  instruction. But unless you're instructed not to
9  answer a question, we will expect you to answer the
10  question that's been asked, okay?
11      A. Okay.
12      Q. And, ma'am, you understand that the oath
13  that you took just a few minutes ago is the same oath
14  that you would take if you were sitting in a
15  courtroom and testifying live before a judge or jury?
16      A. I do.
17      Q. Okay. And are you under any impairment
18  that would in any way affect your testimony here
19  today?
20      A. No.
21      Q. Okay. So there's no medications or alcohol
22  or anything that you can think of that would affect
23  your ability to testify truthfully?
24      A. No.
25      Q. Okay. When did you first contact an

Page 11

1  attorney?
2          MS. FISHER: Objection. Form.
3          You can answer.
4      Q. That's okay. You -- it's -- it's not for
5  your lawyer to answer the questions. If you don't
6  recall something, that's okay for you to say that as
7  well.
8      A. I don't recall the exact date.
9      Q. Okay.
10      A. But it was certainly after I was diagnosed.
11      Q. Okay. And do you -- do you recall roughly
12  how long it would have been after you're diagnosed?
13  A month, two months?
14      A. I don't recall.
15      Q. And how did you go about the process of
16  finding an attorney?
17          MS. FISHER: Objection. Form.
18      A. I researched for doctors and attorneys.
19      Q. Okay. So when you researched, did you just
20  go on-line and do some research?
21      A. Yes. And I asked for reading material
22  and...
23      Q. Okay. And did you find any of your
24  attorneys -- did you -- strike that.
25          Did you find any of your medical doctors

Page 12

1  on-line when you did your research?
2      A. Yes.
3      Q. Okay. Which -- which medical doctors did
4  you find that -- that you ultimately treated with
5  on-line?
6      A. Dr. Harpole, the surgeon that specialized
7  in the mesothelioma operation.
8      Q. Okay. And is Dr. Harpole, where -- where
9  is he located?
10      A. He's at Duke.
11      Q. Okay. Any -- any of your other doctors
12  that you found via Internet searching?
13      A. No. He was the one that I narrowed it down
14  to.
15      Q. Okay. With respect to attorneys, prior to
16  contacting Waters & Kraus, did you contact any
17  attorneys?
18      A. No, I didn't.
19      Q. Okay. Ms. Anderson, what did you do to
20  prepare for the deposition here today?
21          MS. FISHER: Objection.
22  Attorney-client privilege.
23      Q. Other than --
24          MS. FISHER: You can --
25      Q. -- other than -- other than specifically

Page 13

1  what your attorneys talked to you about?
2      A. Just to make sure I have my facts straight.
3      Q. Okay.
4      A. And try to recollect everything that I
5  could.
6      Q. Understood.
7          So I take it you then met with your
8  attorneys, correct?
9      A. Yes.
10      Q. Okay. And how many times did you meet with
11  your attorneys in preparation for the deposition
12  today?
13      A. Two.
14      Q. Okay. And when -- when were those
15  meetings?
16          MS. FISHER: Objection.
17  Attorney-client privilege.
18          THE WITNESS: Is it okay? Can I
19  answer?
20          MS. FISHER: (Counsel moves head up
21  and down.)
22      A. Okay. Day before yesterday and
23  yesterday --
24      Q. Okay.
25      A. -- for a short period of time.

Page 14

1      Q.   Okay.  And how long did you meet with them
2   during the first meeting?
3      A.   Probably an hour-and-a-half.
4      Q.   Okay.
5      A.   Maybe two hours.
6      Q.   Okay.
7      A.   Each day.
8      Q.   And how long did you meet with them during
9   the second meeting?
10     A.   About the same time.
11     Q.   Okay.  During the course of those meetings,
12  were you shown any written materials or photographs?
13         MS. FISHER:  Objection.
14  Attorney-client privilege.
15     A.   No.
16     Q.   Okay.  After having those deposition
17  preparation meetings, do you feel that you're fully
18  prepared to testify today?
19     A.   Yes.
20     Q.   Okay.  Is there anything else you can think
21  of that you wish you had done to prepare for the
22  deposition today?
23         MS. FISHER:  Objection.  Asked and
24  answered.
25     A.   No.

Page 15

1      Q.   Okay.  Have you ever provided any trial
2   testimony?
3      A.   No.
4      Q.   Okay.  And have you ever provided an
5   affidavit or a sworn statement prior to today?
6      A.   No.
7      Q.   Okay.  There -- I believe there were some
8   verifications or affidavits that were associated with
9   your discovery answers that were written questions.
10  Do you recall reviewing that and executing an
11  affidavit or verification regarding those answers?
12     A.   Was that the -- something I would have
13  through my attorney?
14     Q.   Sure.  Sure.  They would have given them to
15  you.
16     A.   Yes.
17     Q.   And then you would have gone before a
18  notary public and sworn that those were true.
19     A.   And verified, right.  I did that, yes.
20     Q.   Okay.  When you went before the notary
21  public, you swore that those answers were true --
22     A.   I did.
23     Q.   -- to the best of your knowledge, right?
24     A.   I did.
25     Q.   Okay.  Now, have you -- have you ever filed

Page 16

1   or has anyone on your behalf ever filed a claim for
2   you other than the one that's the subject of this
3   lawsuit?
4          MS. KEYES:  Objection.
5          MS. FISHER:  Objection.
6   Attorney-client privilege.  It's --
7          MS. KEYES:  Instruct the witness not
8   to answer.
9          MS. FISHER:  Yeah.  Thank you.
10     Q.   And, ma'am, your attorney just instructed
11  you not to answer the question.  I take it you're
12  going to follow the instruction of your attorney and
13  not answer; is that right?
14     A.   Sure.
15         MR. COOK:  Just to clarify the record,
16  was the question whether or not she had previously
17  filed a lawsuit?
18         MR. STURM:  Whether she had filed a
19  claim or whether anyone had filed a claim on her
20  behalf.
21         MR. COOK:  And the objection was
22  attorney-client privilege?
23         MS. FISHER:  Yes.  And we instructed
24  the witness not to answer.
25         MR. COOK:  Okay.  Thanks.

Page 17

1      Q.   Ms. Anderson, have you ever seen any claim
2   forms before?
3          MS. FISHER:  Objection.  Same
4   objection.
5          MS. KEYES:  Same instruction.
6          MS. FISHER:  Same instruction not to
7   answer.
8      Q.   Okay.  And, Ms. Anderson, we're just going
9   to make a record.  So am I correct that you're going
10  to follow your attorney's instruction?
11     A.   Yes.
12     Q.   Okay.  Have you ever provided any answers
13  to claim form questions before?
14         MS. FISHER:  Same objection.  Same
15  instruction, not to answer.
16     Q.   Okay.  And, Ms. Anderson, are you going to
17  follow the instruction of your attorney and -- and
18  not answer that question?
19     A.   Yes.  Yes.
20     Q.   And, again, I -- I take it -- well, I'm
21  just going to make a record.
22         Do you recall if your answers to those
23  claim forms were accurate?
24         MS. FISHER:  Same objection.  Same
25  instruction, not to answer.

Page 18

1    Q.  Okay.  Ms. Anderson, you're not going to
2  follow — strike that.
3        Ms. Anderson, you're going to follow the
4  instruction of your attorney and not answer that
5  question?
6    A.  Yes.
7    Q.  Okay.  Did you identify all the exposures
8  that you were aware of in those claim forms?
9        MS. FISHER:  Same objection.  Same
10 instruction, not to answer.
11   Q.  Okay.  And, Ms. Anderson, you're going to
12 follow the instruction of counsel and not answer that
13 question; is that correct?
14   A.  Yes.
15   Q.  Okay.  I want to next ask you about your --
16 the interrogatory answers.  I take it you did not
17 draft those answers to interrogatories, correct?
18       MS. FISHER:  Objection.  Form.
19   Q.  You can answer that.
20       MS. FISHER:  You can answer the
21 question.
22       THE WITNESS:  No.
23   Q.  Okay.  I take it you were — you were just
24 provided those by your attorney and you verified that
25 they were correct and accurate, correct?

Page 19

1        MS. FISHER:  Objection to form.
2        MS. KEYES:  Objection.  Attorney-
3  client privilege.
4    Q.  Okay.  And --
5    A.  Okay.  I — I didn't understand the
6  question.  I'm sorry.
7    Q.  I'll rephrase it.
8        Is it correct that you didn't -- that you
9  did not draft those answers to interrogatories?
10       MS. FISHER:  Objection.
11   Q.  Correct?
12       MS. FISHER:  Attorney-client
13 privilege.
14   A.  No.
15   Q.  Okay.  Did you review those answers to
16 interrogatories in preparation for today's
17 deposition?
18       MS. FISHER:  Objection.
19 Attorney-client privilege.
20       THE WITNESS:  Should I answer?
21       MS. KEYES:  You can -- you can answer
22 the question.
23       MS. FISHER:  You can answer.
24       THE WITNESS:  I'm not sure what the
25 answer is.

Page 20

1        MS. FISHER:  Do you want him to ask
2  the question again?
3        THE WITNESS:  Well, I want to be sure
4  that I answer the right question, but I --
5    Q.  Fair enough.  Understood.  Answers to
6  interrogatories sometimes can be confusing --
7    A.  Um-hum.
8    Q.  -- to non-lawyers.
9        They essentially were a document where
10 there were written questions and there were your
11 written answers --
12   A.  Um-hum.
13   Q.  -- to those questions.
14   A.  Okay.
15   Q.  Do you recall looking at those in
16 preparation for the deposition?
17   A.  You're talking about the ones that I had
18 notarized?
19   Q.  Yes.
20   A.  Yes.
21   Q.  Okay.  And did you also look at — there
22 were some work history sheets that were provided.
23 Did you look at those in preparation for the
24 deposition?
25       MS. FISHER:  Objection.

Page 21

1  Attorney-client privilege.
2        You can still answer.
3    A.  Yes.
4    Q.  Okay.  Any other documents you recall
5  looking at in preparation for the deposition other
6  than those?
7        MS. FISHER:  Objection.
8  Attorney-client privilege.
9    A.  I — I don't recall.
10   Q.  Okay.  For example, you didn't review any
11 deposition transcripts or anything like that,
12 correct?
13       MS. FISHER:  Objection.
14 Attorney-client privilege, asked and answered.
15   A.  I don't recall.
16   Q.  Okay.  Now, I want to go through some of
17 the information that was provided in your answers to
18 interrogatories and I'll try to expedite some of
19 these answers.
20       Is it correct that you're 66 years old?
21   A.  Yes.
22   Q.  And you were born December 3, 1940?
23   A.  Yes.
24   Q.  Your Social Security number, is that
25 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?

Page 22

1    A.  Yes.
2    Q.  You currently reside at 913 Red Coat Court
3  in Virginia Beach?
4    A.  Yes.
5    Q.  You've been there since June of 1999?
6    A.  Yes.
7    Q.  Prior to that time, you lived at 1320
8  Carolyn Drive in Virginia Beach?
9    A.  Yes.
10   Q.  And you lived there from approximately June
11 of 1986 to June of 1999; is that correct?
12   A.  Right.
13   Q.  Okay.  Prior to the Caroline Drive address
14 or Carolyn Drive address --
15   A.  Carolyn.
16   Q.  -- where did you -- where did you reside?
17   A.  I lived in Washington for about four or
18 five years.
19   Q.  Where in Washington -- Washington, DC?
20   A.  Yes.
21   Q.  And can you tell me where in Washington you
22 lived?
23   A.  I'm sorry.  I can't remember my address.
24   Q.  Okay.  Were you --
25   A.  Hmm?

Page 23

1    Q.  Go ahead.
2    A.  I'm trying to remember the -- the address.
3    Q.  Okay.  Well, maybe I can help.  Were you in
4  downtown -- were you within the District?
5    A.  I wasn't in DC.  I was in Arlington.
6    Q.  Okay.
7    A.  I was in one of the high-rises that had
8  collapsed and then they rebuilt it, and I can't
9  remember the name of it.
10   Q.  What -- what section of Arlington; Rosslyn,
11 Clarendon?
12   A.  No.  It's -- it's about three exits before
13 you get -- close to King Street.
14   Q.  Okay.  Okay.  So almost to the Alexandria
15 side almost?
16   A.  Yeah.
17   Q.  Okay.
18   A.  It was 3701 George Mason Drive.  And I
19 think that was Alexandria.
20   Q.  Okay.  And you resided there from
21 approximately 1981 or 1982 to June of 1986?
22   A.  Until '85.
23   Q.  Okay.  And where did you go from there?
24   A.  I moved back to Virginia Beach.
25   Q.  And where did you live in Virginia Beach?

Page 24

1    A.  At the Carolyn Drive address.
2    Q.  Okay.  So that -- the correct date, then,
3  to correct your answers to interrogatories, would
4  have been the more accurate date is 1985; is that
5  right?
6    A.  For what?  For the Carolyn Drive or --
7    Q.  Yes.
8    A.  I built a hotel.  When I built the hotel, I
9  lived in it for a short period of time and then I
10 moved to Carolyn Drive.
11   Q.  Okay.  Where did you -- did you build --
12 where did you build the hotel?  In Virginia Beach?
13   A.  Yes.  304 28th Street, Virginia Beach,
14 Virginia.
15   Q.  And what was -- is that hotel still
16 standing?
17   A.  Yes.  It has a different name now since I
18 sold it.
19   Q.  When did you sell it?
20   A.  2000.  Yeah.  2000.
21   Q.  Around 19 -- or I'm sorry -- around 2000?
22   A.  Right.
23   Q.  What was the name of the hotel when you
24 owned it?
25   A.  The Captain's Quarters Hotel.

Page 25

1    Q.  Do you know the name of it today?
2    A.  No.  It's a -- it's a Spanish or Mexican
3  name.
4    Q.  And who else had an ownership interest in
5  the hotel when you owned it?
6    A.  My brother, my mother, and one of my aunts.
7    Q.  And what's your brother's name?
8    A.  Bruce Mills.
9    Q.  And what is your mother's name?
10   A.  Eleanore Mills.
11   Q.  Has she ever been known by any other name
12 other than Eleanore Mills?
13   A.  No.
14   Q.  Well, what's her maiden name?
15   A.  Masters.
16   Q.  And other than her marriage to your father,
17 did she have any prior marriages?
18   A.  No.
19   Q.  Okay.  And what's your aunt's name?
20   A.  Paula Collins.  And she's deceased.
21   Q.  Is your mother still living?
22   A.  Yes.
23   Q.  Where does she reside?
24   A.  4301 Thalia Road.
25   Q.  How do you spell that?

Page 26

1    A.   T-h-a-l-i-a, Virginia Beach, Virginia.
2    Q.   And your brother, Bruce Mills, where does
3    he reside currently?
4    A.   I can give you his business address: 4145
5    Virginia Beach Boulevard, Virginia Beach, Virginia.
6    Q.   And how is he employed?
7    A.   He's an attorney.
8    Q.   What -- what law firm is he with?
9    A.   He's an independent.
10   Q.   While we're on the subject, do you have any
11   other brothers or sisters other than Bruce?
12   A.   I have two other brothers.
13   Q.   Okay.  What are their names?
14   A.   Rodney Mills.
15   Q.   Is he "Jr."?
16   A.   I don't think so.  No, he's not.
17   Q.   Is that your father's name as well?
18   A.   Um-hum.  Yes.
19   Q.   So you believe he had a different middle
20   name?
21   A.   Correct.
22   Q.   What's your other brother's name?
23   A.   William Mills.
24   Q.   Where does -- does Rodney, does he go by
25   "Rodney"?

Page 27

1    A.   Yes.
2    Q.   And the same with Bruce, does he go by
3    "Bruce"?
4    A.   Yes.
5    Q.   And William, does he go by "William"?
6    A.   He goes by "Billy."
7    Q.   Billy?
8    A.   Um-hum.
9    Q.   Okay.  Where does -- where does Rodney
10   live?
11   A.   He lives with my mother at the 4301 Thalia
12   Road.
13   Q.   And where does -- where does Billy reside?
14   A.   He lives on Thalia Road, but I don't know
15   the street address.  It's across the street from my
16   mother.
17   Q.   Now, how did he come to live across the
18   street from your mother?  In other words, was there a
19   parcel of land that your family owned that you had
20   parceled or he just bought a house next door?
21   A.   No.  My mother is what I call an invalid
22   and we hire full-time live-in nursing care.  And he
23   wanted to be close to her.  So whenever a house came
24   available --
25   Q.   He bought it?

Page 28

1    A.   -- then he bought the house.
2    Q.   Okay.  Did -- did your brother Bruce ever
3    work in any shipyards?
4    A.   No.
5    Q.   Rodney?
6    A.   No.
7    Q.   Just to clarify for the record, I was
8    referring to your brother Rodney.
9         And then how about Billy?
10   A.   No.
11   Q.   Okay.  Okay.  I'm going to go back to the
12   residence -- residences where you've -- where you've
13   resided.  Is it correct you moved to the George Mason
14   Drive address in approximately 1981 or 1982?
15   A.   As far as I can remember.  I know I
16   provided those answers, so they are documented.  But
17   I think that's correct.
18   Q.   Okay.  Okay.  And just so you know, the --
19   the -- your answers didn't go back further than your
20   Carolyn Drive address.
21        Prior to -- in other words, I would help
22   you out if there was more information that I had.
23   A.   Um-hum.
24   Q.   Prior to the George Mason Drive address,
25   where did you reside?

Page 29

1    A.   There are about three addresses that I
2    lived at for a short period of time.  One of them was
3    Pine Tree Drive, Virginia Beach, Virginia.  I don't
4    remember the street address.  But I only lived there
5    for about a year and then moved to Washington.
6    Q.   Okay.
7    A.   And then there were -- there was a
8    townhouse I lived in before I bought the house on
9    Pine Tree Drive.  It was in the Arrowhead section,
10   but I don't recall the street address on that.
11   Q.   The Arrowhead section of Virginia Beach?
12   A.   Um-hum.
13   Q.   Okay.  Prior to that -- or I'm sorry.
14   Strike that.
15        How long did you reside in the townhouse?
16   A.   I want to guess a year or year-and-a-half.
17   I'm not real sure at this moment.
18   Q.   Okay.  Prior to living in the townhouse,
19   where did you live?
20   A.   I lived at Five Forks Road in the
21   subdivision that I currently live in.
22   Q.   What's the name of that subdivision?
23   A.   Give me just a minute.
24   Q.   Sure.  Take your time.
25   A.   Lake Smith Terrace.

Page 30

1    Q.  What -- what prompted you to move to
2  Washington, DC?
3    A.  My husband retired from the Navy.  He took
4  a position in Washington, and I transferred with
5  civil service.
6    Q.  Okay.  How long did you reside at Five
7  Forks Road, approximately?
8    A.  I'm not exactly sure.
9    Q.  Would you say more or less than a year?
10       MS. FISHER: Objection.  Form.
11    A.  Probably a year.
12    Q.  Okay.  Prior to Five Forks Road, where did
13  you reside?
14    A.  Witch Duck Road?
15    Q.  No.  Five Forks Road?
16    A.  No.  Witch Duck.
17    Q.  Oh, Witch Duck is the place where you
18  resided?
19    A.  It's the road I lived on.
20    Q.  Okay.  And that's in Lake Smith Terrace?
21    A.  No.
22    Q.  Okay.
23    A.  That's in Witch Duck.
24    Q.  Okay.  All right.  How long did you reside
25  there?

Page 31

1    A.  I want to say four, five years.
2    Q.  And would that have been -- when did you
3  move from there?  Would that have been around 1978?
4    A.  Yes.
5    Q.  And so you would have moved to that address
6  around '74, '73?  Does that sound right?
7    A.  I would say that's close.
8    Q.  Okay.  And prior to residing on Witch Duck
9  Road, where did you live?
10    A.  Constitution Drive in Pembroke.
11    Q.  And is that part of Virginia Beach or --
12    A.  Yes.
13    Q.  Okay.  And how long did you reside there?
14    A.  I would say since 1961 or '2 until I moved
15  to Witch Duck.  This is the first time I've been
16  asked about those old residents, and it's hard --
17  hard to recollect --
18    Q.  Sure.  I understand.
19    A.  -- times and dates.
20    Q.  Prior to residing at the Constitution Drive
21  address, where did you live?
22    A.  For about a year, I lived in Charleston,
23  West Virginia.
24    Q.  And do you recall the address?
25    A.  No.  It was within a block of the capital,

Page 32

1  but I don't recall the address.
2    Q.  Okay.  And prior to that address, where did
3  you live?
4    A.  I lived for a short period of time in
5  Norfolk, but I don't know the exact address.  I was
6  going to nursing school at that time.
7    Q.  Where did you go to nursing school?
8    A.  DePaul.
9    Q.  Did you finish?
10    A.  I was an x-ray technician and I didn't
11  finish, but I did continue and become an x-ray
12  technician.
13    Q.  You did that in the field?
14    A.  Um-hum.
15    Q.  And did you work for DePaul as well as an
16  x-ray technician, DePaul Hospital or --
17    A.  Well, I did -- did the x-ray technician
18  work, yes.
19    Q.  Okay.  Is that where the nursing school
20  was, at the hospital?
21    A.  Yes.
22    Q.  Okay.  And I think the answers -- your
23  answer said -- how long you did that?  Was it two
24  years or so or --
25       MS. FISHER:  Objection to form.

Page 33

1    A.  I believe.  I believe so.
2    Q.  What's -- what's your best estimate?  Is
3  two years your best estimate or...
4    A.  I would say that's a fair length of time.
5    Q.  And did you live in Norfolk for that time
6  period when you were working --
7    A.  Yes.
8    Q.  -- and going to school at DePaul?
9    A.  Yes.
10    Q.  Okay.  And prior to -- let's see.  That
11  would have been from approximately 1958 to 1960?
12  Does that sound right?
13    A.  Yes.
14    Q.  So prior to the time you were 18 years old,
15  where did you reside?
16    A.  At home with my mother.
17    Q.  Okay.  And did you live in the same family
18  house for those 18 years or did -- did your family
19  move?
20    A.  We had lived in different houses, but --
21    Q.  Okay.  We'll keep going then.
22       Prior to residing in Norfolk, where --
23  where did you reside?
24    A.  It was Virginia Beach Boulevard.  I want to
25  say 4140, but I'm not exactly sure because that's

Page 34

1  been a long time ago.
2     Q.  Sure.  How long did you reside there?
3     A.  I know I resided there until I was 17 or
4  18, but I don't know at what time we moved into that
5  residence.  I want to say around six years, as far as
6  I can remember.
7     Q.  So roughly 1952 to around 1958?  Does that
8  sound about right?
9     A.  It's more like '50, 1950.
10    Q.  Okay.  Does that sound about right that it
11 was seven or eight years that you lived there?
12    A.  As far as I can remember.
13    Q.  Okay.  Prior to that address, where did you
14 reside?
15    A.  I have no idea.
16    Q.  Okay.
17    A.  I don't remember.
18    Q.  Okay.  So it was prior to the time you were
19 10 years old?
20    A.  Yes.
21    Q.  Right?
22    A.  Um-hum.
23    Q.  Okay.  Is there any way you could get that
24 information -- do you -- are your brothers older?
25    A.  One is older and two are younger.

Page 35

1     Q.  Okay.  Is it a fair statement, then, that
2  you don't recall -- you don't have any memories from
3  that prior address?
4     A.  Right.  I don't remember --
5     Q.  Okay.
6     A.  -- that.
7     Q.  For instance, while you -- was it only one
8  prior address where you lived prior to the Virginia
9  Beach Boulevard address?
10    A.  I don't recall.
11    Q.  Okay.  Is it hard -- very difficult for you
12 to remember things that happened up to the time you
13 were about 9 --
14          MS. FISHER:  Objection.  Form.
15    Q.  -- 9 or 10?
16    A.  No.
17    Q.  Okay.  It's just you don't -- was it in
18 Virginia Beach?
19    A.  Yes.  I've always lived in Virginia Beach.
20    Q.  Okay.  Can you describe the house for me?
21    A.  No.
22    Q.  So you wouldn't be able to describe any
23 particular rooms or anything like that?
24          MS. FISHER:  Objection.  Asked and
25 answered.

Page 36

1     A.  No.
2     Q.  Okay.  Let's start with that address, that
3  unknown address where you lived until you were 9 or
4  10.  Who lived with you at that address?
5     A.  My mother, my father and my three brothers.
6     Q.  And to your recollection, no one else
7  resided with you at that address for any period of
8  time?
9     A.  No.
10    Q.  During that period of time, do you recall
11 where your -- your father worked?
12    A.  He worked several places.  The one I
13 remember clearly was when he worked at the shipyard.
14 That was when I was older.  And, you know, I can't
15 remember other jobs, except that he did work other
16 places.
17    Q.  Okay.  Do you recall the names of any of
18 the other places where he worked other than the
19 shipyard?
20    A.  No.
21    Q.  Do you recall when he first went to work at
22 the shipyard?
23    A.  I'm trying to back up my memory.  19 -- let
24 me think about that just a minute because I want to
25 make sure I give you the right answer --

Page 37

1     Q.  Okay.
2     A.  -- as clear as I can.
3        I know around the time that he was working
4  at the shipyard, I was, I'd say, 13 or 14.  So I
5  would have to back it up to try to figure it out.
6     Q.  Okay.  I think I can help you because you
7  were born --
8     A.  '53 or '54.
9     Q.  -- in 1940, which is nice for -- for us
10 that are challenged mathematically.
11    A.  Well --
12    Q.  So it would be 1953 or 1954?
13    A.  Right.
14    Q.  Do you recall what his position was when he
15 started at the shipyard?
16    A.  A pipe coverer and insulator.
17    Q.  Do you know he came to work at the
18 shipyard?
19    A.  Most of the people in the area tried to get
20 to work at the shipyard.
21    Q.  Okay.  He -- to your knowledge, he applied
22 and was accepted, something like that?
23    A.  Um-hum.
24          MS. FISHER:  Objection.  Form.
25    A.  Yes.

Page 38

1    Q.  Okay.  The reason why I ask that is because
2   sometimes there's an uncle, there's a cousin, there's
3   somebody who already works at the shipyard who helps
4   someone -- someone get a job there.  I was just
5   wondering if maybe that happened in your father's
6   case, to your knowledge?
7           MS. FISHER:  Objection.  Form.
8    A.  It's possible, but I have no idea.
9    Q.  Okay.  Do you recall any family members --
10   uncles, cousins, anyone else -- that ever worked at
11   the shipyards?
12   A.  No.
13   Q.  Okay.  And when you were 13 or 14, what
14   school were you -- strike that.
15       When you were 13 or 14, what school did --
16   were you attending?
17   A.  Norfolk Catholic.
18   Q.  Is that high school?
19   A.  Yes.
20   Q.  And while you were in high school, what
21   activities were you involved in during the
22   summertime?
23   A.  I've worked since I was 14 or 15, so I
24   always had a job, telephone operator or working at
25   Smith & Welton's or --

Page 39

1    Q.  What was the second one you mentioned,
2   Smith Welton?
3    A.  Smith & Welton Department Store.
4    Q.  Was it Wilkins?
5    A.  W-e-l-t-o-n.
6    Q.  Okay.  So while you were in high school --
7   during the summers while you were in high school, you
8   would generally -- you were employed; is that right?
9           MS. FISHER:  Objection.  Form.
10   A.  Yes.
11   Q.  Okay.  And you were employed full time
12   during the summers?
13   A.  Yes.  And part time on weekends.
14   Q.  While school was in session; is that right?
15   A.  Right.
16   Q.  Do you recall when you first went -- how
17   old you were when you first went to work?
18   A.  I want to say 14 because I remember I was
19   very young and all the rest of my friends didn't
20   work.
21   Q.  And when you were 14 and you started to
22   work, do you -- do you recall where you were first
23   employed?
24   A.  I want to say my first employment was the
25   telephone company of Virginia Beach.

Page 40

1    Q.  So that would have been when you were 14
2   years old, correct?
3    A.  Fourteen, 15.
4    Q.  Okay.  And your position there was
5   telephone operator?
6    A.  Correct.
7    Q.  And what did that consist of?
8    A.  Working a manual switchboard.
9    Q.  Okay.  While you were employed there, do
10   you recall any type of construction work taking place
11   around you?
12           MS. FISHER:  Objection.  Form.
13   A.  No.
14   Q.  And when you went to work there at the
15   telephone company of Virginia Beach, did you start
16   out part time on the weekends?
17   A.  I don't recall, other than I worked full
18   time in the summer and I'm not sure how long I worked
19   there.
20   Q.  Okay.
21   A.  But it would have been full time in the
22   summer for sure.
23   Q.  Okay.  While you were in high school, any
24   other places that you recall working other than the
25   telephone company of Virginia Beach and Smith &

Page 41

1   Welton?
2    A.  No.
3    Q.  Do you recall any construction work at
4   Smith & Welton?
5    A.  No.
6    Q.  Do you recall -- strike that.
7       At Norfolk Catholic, what -- were you
8   involved in any after-school activities?
9    A.  Majorette, different clubs I belonged to.
10   Q.  And would that require you to attend
11   activities after school?
12   A.  Yes.
13   Q.  Now, the majorette, was that something
14   that -- when did you first join majorette?
15   A.  I believe it was in my freshman year.
16   Q.  Did you continue as a member of the
17   majorette throughout your high school years?
18   A.  No.  Because they did away with the ball
19   team.
20   Q.  Do you recall what year that was?
21   A.  It must have been the following year.
22   Q.  So did you do that your sophomore year as
23   well or only your freshman year?
24   A.  Freshman year.
25   Q.  Was that something that you did year round

Page 42

1  or was it something you did for half of the school
2  year?
3      A.   Half the school year or -- or whenever
4  they, you know, had ball games.
5      Q.   And how long would you practice after
6  school? For a few hours, do you recall?
7      A.   On weekends. A few hours each weekend.
8      Q.   Okay. So it wasn't anything that required
9  you to stay after school and do work; is that
10 right --
11            MS. FISHER: Objection. Form.
12     Q.   -- and -- and practice?
13     A.   Not that I recall.
14     Q.   And did you have any clubs that you were a
15 member of that required you to stay after school?
16            MS. FISHER: Objection. Asked and
17 answered.
18     A.   Well, the Latin Club or -- you know. But I
19 don't recall how often I had to stay after school.
20     Q.   Okay. Did you do any activities with your
21 friends after -- after school?
22     A.   No. Because it took me too long to get
23 home from school.
24     Q.   How did you get to and from school?
25     A.   Took four buses a day.

Page 43

1      Q.   How long would that take to get to -- one
2  way?
3      A.   Two hours.
4      Q.   So do you recall what time you would leave
5  in the morning to get there?
6      A.   Usually 7:00.
7      Q.   Do you recall what time you would
8  generally get home?
9      A.   Between 5:00 and 6:00 if I didn't miss a
10 bus.
11     Q.   And your father at the shipyard, do you
12 recall what shift he worked on?
13     A.   I don't remember exactly, but I'm more
14 inclined to say the morning shift because he would
15 get home before it got dark.
16     Q.   Do you recall roughly what time he would
17 get home from work when he worked at the shipyard?
18     A.   I don't recall exact time.
19     Q.   But you would say it was the morning --
20 would he be gone -- when you would leave for work --
21 I'm going to strike that.
22            When you would leave for school --
23     A.   Um-hum.
24     Q.   -- would your father have already left to
25 go to the shipyard while you were in high school?

Page 44

1            MS. FISHER: Objection. Form.
2      A.   I would say yes.
3      Q.   And when you returned to the house from
4  school between 5 and 6 o'clock, was your father
5  already home?
6      A.   I would say most of the time. But then
7  there were times when he would, you know, come in
8  after me.
9      Q.   Sure. But, generally speaking, he was --
10 he -- he would be home before you would get home from
11 high school, correct?
12            MS. FISHER: Objection. Asked and
13 answered.
14     A.   I don't -- I don't know that it would be
15 more one way or the other.
16     Q.   Is it -- you don't recall one way or
17 another?
18     A.   I don't recall whether he would be home
19 before me more times than he would be home the same
20 time or...
21     Q.   Okay. Okay. So there were -- there were
22 times when you would see your father come home from
23 work?
24            MS. FISHER: Objection. Form.
25     A.   Sure.

Page 45

1      Q.   While you were in high school, right?
2      A.   Yes.
3      Q.   And during those times when he was working
4  at the shipyard, do you recall what he was wearing
5  when he arrived home?
6      A.   Well, he had his normal work clothes on.
7      Q.   And what -- what did those look like?
8      A.   I don't know. Just pants and shirt and,
9  you know, I -- I can't be more specific than that.
10     Q.   Did he generally wear the same thing to
11 work when he worked at the shipyard?
12     A.   I really can't say.
13     Q.   Do you recall if he wore coveralls or
14 overalls or anything like that?
15            MS. FISHER: Objection. Form.
16     A.   I don't recall.
17     Q.   So is it a fair statement you don't have a
18 recollection of whether he wore coveralls, overalls,
19 the types of pants or shirts that he wore when --
20 when he went to work at the shipyard?
21            MS. FISHER: Objection. Form, asked
22 and answered.
23     A.   That's correct.
24     Q.   Or what he was wearing when he arrived
25 home; is this right?

Page 46

1           MS. FISHER: Objection. Asked and
2 answered.
3     A.  Correct.
4     Q.  Was there any way for you to tell whether
5 he was wearing the same clothes that he had worn to
6 work when he arrived home in the evenings while he
7 worked at the shipyard?
8           MS. FISHER: Objection. Form.
9     A.  No.  I can't -- I don't recall that.
10    Q.  So is it a fair statement, then, that it's
11 possible that your father wore one set of clothes to
12 work and -- and changed out of them and wore clean
13 clothes home?  Is it -- do you have any basis to say
14 whether the clothes that he came home in were the
15 same ones that he wore while he was working at the
16 shipyard?
17    A.  I have --
18          MS. FISHER: Objection. Form, asked
19 and answered.
20    A.  I have no idea.
21    Q.  Your father took the bus to work; is that
22 right?
23          MS. FISHER: Objection to form.
24    Q.  At the shipyard?
25    A.  As far as I remember, he used to get on

Page 47

1 the -- the bus from the beach to the shipyard.
2     Q.  Do you ever recall any time period when he
3 drove himself to work while he worked at the
4 shipyard?
5     A.  I don't recall.
6     Q.  Do you ever recall your -- whether your
7 father would come home from the shipyard and
8 immediately change his clothes?
9           MS. FISHER: Objection. Form, asked
10 and answered.
11          You can answer it.
12    A.  Yes.
13    Q.  So is it your recollection that there were
14 times when he would come home and -- and immediately
15 change out of his clothes?
16    A.  Well, he always did that.
17    Q.  Okay.  Do you recall where he changed out
18 of his clothes?
19    A.  In the bedroom, I assume.
20    Q.  Okay.  So you weren't around when your
21 father was changing out of his clothes, correct?
22    A.  Well, I was in the house, but not -- not in
23 the room with him.
24    Q.  Right.  He was in his bedroom with the door
25 shut when he was changing out of his clothes,

Page 48

1 correct?
2     A.  Yeah.
3           MS. FISHER: Objection. Form.
4     Q.  And do you know where his work -- where
5 his -- the clothing that he changed out of, where
6 those clothes went?
7     A.  Yes.  They went in the washing machine to
8 be washed.
9     Q.  Would your father take those to the washing
10 machine and put them in himself?
11          MS. FISHER: Objection. Form.
12    A.  More than likely, he would give them to me
13 or my mother.
14    Q.  Was there a clothes hamper?
15    A.  No.  We would wash the dirty clothes, you
16 know, right away.
17    Q.  So did you -- did you do laundry every day
18 at your house?
19    A.  As -- as it was needed.  If it was work
20 clothes that he needed, they had to be washed.
21    Q.  Okay.  Do you have a recollection of
22 doing -- of doing laundry while your father was in
23 high school?
24          MS. FISHER: Objection.
25    Q.  Okay.

Page 49

1     A.  While my father was in high school?
2     Q.  Okay.  Strike that.
3     A.  Yeah.
4     Q.  Okay.  Do you have a recollection of ever
5 taking your father's work clothes from him and
6 putting them in a washing machine?
7     A.  Absolutely.
8     Q.  Is -- do you recall the condition of
9 those clothes?
10    A.  I recall they were dusty and dirty.  And I
11 even recall the type of washing machine I used.
12    Q.  Okay.  What -- what type of washing machine
13 was that?
14    A.  It was the old-fashioned agitator that you
15 would hook up to the kitchen faucet to get water in
16 it.  And then after the clothes were finished, you
17 would run them through the ringer.
18    Q.  Okay.  And -- and, again, this was while
19 you were in high school?
20    A.  Right.
21    Q.  Okay.  Did your mother work?
22    A.  Yes.
23    Q.  What was her job?
24    A.  She worked for the government as a payroll
25 clerk.

1   Q.   And what was the time period -- what was
2   her shift?
3   A.   Golly.  My mother retired early and I'm
4   trying to think what -- what year she retired.  She
5   retired on disability and I don't know -- I'm not
6   exactly sure what year it was that she retired.  When
7   she did work, her shifts were probably, you know, the
8   morning shifts.
9   Q.   Would your mother be home when you got home
10  from school while you were in high school?
11  A.   From high school, yes.
12  Q.   Was your mother on disability at that time?
13  A.   Well, I -- I want to say she was.  I'm not
14  exactly sure, but I know she did, you know, retire
15  early.
16  Q.   What was she on disability for?
17  A.   I don't know if it was because of her
18  rheumatoid arthritis in her back or nerves, you know.
19  So I'm not exactly sure why she retired.
20  Q.   Okay.  And while you were in high school,
21  your mother was physically capable of doing the
22  laundry; is that right?
23       MS. FISHER:  Objection.  Form.
24  A.   We both did it.
25  Q.   Right.  But, again, my question was whether

1   your mother was capable of doing it while you were in
2   high school.  She was?
3   A.   Yes.
4   Q.   Okay.  And there were -- there were times
5   when you would help out as well; is that right?
6       MS. FISHER:  Objection.  Form.
7   A.   Yeah.  I always had to help out because I
8   was the girl in the family.
9   Q.   Okay.  And do you know if your father
10  would -- would brush off his clothing before he got
11  home from work?
12       MS. FISHER:  Objection.  Form.
13  A.   I don't know what he did before he got home
14  from work.
15  Q.   Okay.  But is it a fair statement that
16  your -- your -- your mother -- your mother wouldn't
17  have allowed your father to just come in the house
18  with dust all over him and walk through the house
19  with dust all over him; is that -- that a fair
20  statement?
21       MS. FISHER:  Objection.  Form.
22  A.   I have no idea.
23  Q.   Okay.  When did your father stop working at
24  the shipyard?
25  A.   I don't have the exact dates.  Only close

1   to this 13, 14, 15-year age for me.  So it would had
2   to have been, I want to say, '53, '54 timeframe.
3   Q.   Is -- is when he stopped working there?
4   A.   I don't know the exact dates.
5   Q.   Okay.  To your knowledge, how long did you
6   father work at the shipyard?
7   A.   Well, I don't know the exact dates, so I
8   can't answer that.
9   Q.   Okay.  What would be your best estimate; a
10  year, two years, three years?
11       MS. FISHER:  Objection.  Asked and
12  answered.
13  A.   A year or two.
14  Q.   Your interrogatory answers state that he
15  stopped working at the shipyard in 1956.  Does that
16  sound about right to you?
17  A.   To my knowledge.  And I'm trying to guess
18  at these time periods.
19  Q.   Okay.
20  A.   At that time, that seemed to be about the
21  time.
22  Q.   Do you know where -- did that information
23  come from you, that date, 1956?
24  A.   It was an -- it was an estimate of my best
25  guess.

1   Q.   Okay.
2   A.   But purely a guess.
3   Q.   Okay.  And so your best guess, based on
4   what you just testified to a minute ago, is that you
5   can't say exactly how long he worked at the shipyard,
6   but your best estimate is a year or two; is that
7   correct?
8       MS. FISHER:  Objection.  Form, asked
9   and answered.
10  A.   Yes.
11  Q.   When you worked at the telephone company,
12  what time would you arrive home?
13  A.   Maybe about 5:00.  This was in the
14  summertime job?
15  Q.   Okay.  Let's start with the summertime.
16  A.   Um-hum.
17  Q.   So during the summertime, what would your
18  shift be?
19  A.   Either 7:00 to 3:00 -- probably a 7:00 to
20  3:00.
21  Q.   And when you worked part time while school
22  was in session, what was your shift?
23  A.   I don't -- I know I worked full time in the
24  summertime for the phone company.  The only part-time
25  job that I worked at, I believe, was the Smith &

1  Welton. So I don't know that I worked part time at
2  the phone company.
3      Q.  Okay.
4      A.  So that would have been the summer months
5  that I worked full time.
6      Q.  Okay. So at Smith & Wilton when you worked
7  part time while school was in session, what was your
8  shift?
9      A.  When I worked part time?
10     Q.  Yes.
11     A.  It would be after school and on weekends.
12     Q.  If it was after school when you were
13  working, what time would you get -- return home?
14     A.  Maybe 9:00.
15     Q.  And would your father already be in bed on
16  those instances?
17         MS. FISHER: Objection. Form.
18     A.  I don't -- I don't recall.
19     Q.  And when you worked on weekends at Smith &
20  Welton, what was your shift?
21     A.  Probably a 9:00 to 5:00.
22     Q.  Any other employment that you recall while
23  you were in high school other than the telephone
24  company and Smith & Welton that you had?
25         MS. FISHER: Objection. Asked and

1  answered.
2      A.  No.
3      Q.  Now, your brothers resided in the same
4  house. Do you recall where your brothers were
5  working? Well, let -- let's start with Billy.
6         While you lived in the -- well, strike
7  that.
8         When did you move out of the family
9  residence?
10     A.  Okay. I know we already discussed that,
11  but let me back up. '57, '58.
12     Q.  Okay. That's right. And then that's when
13  you went to Norfolk, right?
14     A.  Um-hum. Yes.
15     Q.  Prior to that time -- prior to that time,
16  do you recall what jobs Billy had while Billy resided
17  in the family residence?
18     A.  He had none.
19     Q.  Okay. How about Rodney?
20     A.  I believe Rodney joined the Army.
21     Q.  And do you recall how old Rodney was when
22  he joined the Army?
23     A.  I guess around 18.
24     Q.  And when was Rodney born?
25     A.  In 1938.

1      Q.  Okay. So around the time you were 16 years
2  old, he joined the Army?
3      A.  Yes.
4         MS. FISHER: Objection. Form.
5      Q.  And at that time, did he move out of the
6  family residence when he joined the Army?
7      A.  Yes. He went with the Army to Germany.
8      Q.  Okay. Prior to joining the Army, do you
9  recall any jobs that Rodney had?
10     A.  No.
11     Q.  And when was -- when was Billy born?
12     A.  '36. Sorry, the other way around. Okay.
13     Q.  '42; is that right?
14     A.  Yeah. No. Billy is four years younger
15  than me. '44?
16     Q.  Um-hum. And then lastly, Bruce, when was
17  he born?
18     A.  '42.
19     Q.  Do you recall any employment Bruce had
20  while you lived in the family residence?
21     A.  No.
22     Q.  Now, was that -- do you recall whether or
23  not he was employed while you lived in the family
24  residence?
25     A.  I don't recall.

1      Q.  Okay. Okay. You're currently married to
2  Floyd Raymond Anderson; is that correct?
3      A.  Yes.
4      Q.  You were married June 9th of 1977?
5      A.  Yes.
6      Q.  Does he go by the name "Andy"?
7      A.  Yes.
8      Q.  Okay. And what does -- when you met your
9  husband -- well, strike that.
10        When did you first start living with your
11  husband in the same residence?
12     A.  Right after we got married.
13     Q.  And what was his employment at that time?
14     A.  He was a Commander in the Navy.
15     Q.  Where did he work?
16     A.  CINCLANT Fleet Headquarters.
17     Q.  And where is that located?
18     A.  In Norfolk.
19     Q.  And what were his job duties at that time?
20     A.  He worked for NATO.
21     Q.  And was it an office type of job that he
22  had?
23        MS. FISHER: Objection. Form.
24     A.  You know, with NATO, you travel a lot to
25  the Europe, so --

Page 58

1   Q.  It wasn't something where he was -- where
2 he worked aboard ship?
3   A.  No.
4       MS. FISHER: Objection. Form.
5   Q.  Okay. And how did you spell that again --
6 CINC --
7   A.  C-I-N-C --
8   Q.  C-I-N-C.
9   A.  -- L-A-N-T F-l-e-e-t. They might have
10 changed the name since then.
11   Q.  Okay. And how long did he work at CINCLANT
12 Fleet Headquarters?
13   A.  I want to say a year because he was due to
14 retire.
15   Q.  Did he retire after a year?
16   A.  Yes. He retired from there.
17   Q.  Okay. From the Navy?
18   A.  Um-hum. Yes.
19   Q.  Where did he go from there?
20   A.  Went to Washington.
21   Q.  And you may have said this before. I don't
22 remember. What was his employment in Washington?
23   A.  The term is "Beltway Bandit," but he worked
24 for a civilian contractor.
25   Q.  And do you know what his duties were?

Page 59

1   A.  He was an analyst.
2   Q.  And I take it he would not have occasion to
3 board any type of vessels?
4   A.  No.
5       MS. FISHER: Objection. Form.
6   A.  No.
7   Q.  And how long did he do that for?
8   A.  Until 1986, I believe. So that's four --
9 four or five years.
10   Q.  And what did your husband do from there?
11 What was his next employment?
12   A.  Okay. He retired again.
13   Q.  Okay.
14   A.  And then he went to -- back to Virginia and
15 he worked for -- give me just a second, I'll -- he
16 worked for Lucent Technologies.
17   Q.  And how long did he was retired for before he
18 went to work for Lucent?
19   A.  Not very long. He just retired from the
20 one and moved to Virginia Beach since I had been down
21 there with the hotel.
22   Q.  And how long did he work for Lucent?
23   A.  I want to say a couple years.
24   Q.  And as part -- what -- what were his duties
25 with Lucent?

Page 60

1   A.  He was an analyst.
2   Q.  And I take it he would not have occasion to
3 board any vessels during that time period?
4   A.  No.
5   Q.  And what was his next -- what was his next
6 job after that?
7   A.  Mandatory retirement.
8   Q.  Okay. And this time he retired for good?
9   A.  Yes.
10   Q.  Okay. And why -- why did you say it was
11 mandatory?
12   A.  Age.
13   Q.  Okay. And in the CINCLANT job in the --
14 and his job as a Beltway Bandit and his job for
15 Lucent Technologies, do you know if he had any
16 occasion to work around asbestos at any of those
17 sites?
18       MS. FISHER: Objection. Form.
19   A.  I have no knowledge of that.
20   Q.  And you had a prior marriage also to
21 Clarence Thomas Arehart; is that correct?
22   A.  Yes.
23   Q.  And you married him in 1959; is that right?
24   A.  Yes.
25   Q.  And you divorced in '77; is that right?

Page 61

1   A.  Yes.
2   Q.  Did you separate prior to your divorce?
3       MS. FISHER: Objection. Form.
4   A.  We -- yes. You separate. Yeah.
5   Q.  Okay. And when did you separate?
6   A.  I don't recall at this moment. I --
7   Q.  Are you able to give me a ball park of was
8 it '75, '76, '77?
9       MS. FISHER: Objection. Asked and
10 answered.
11   A.  I don't know. Maybe five or six months
12 before -- some time in '76.
13   Q.  And the first time -- and -- and what
14 did -- what did he -- was he known by any nicknames?
15   A.  Just Tom.
16   Q.  Just Tom.
17       And did you live with -- with Tom prior to
18 1959 when you got married?
19   A.  '59. No. No.
20   Q.  And in 1950 -- '59, do you recall what
21 Tom's job was?
22   A.  He worked for a finance company.
23   Q.  Do you recall the name of it?
24   A.  Eastern.
25   Q.  Where was that located?

Page 62

1   A.   They had several branches, but he worked in
2   the Norfolk branch.
3   Q.   Now, also, if you need a break at any
4   time --
5   A.   I'll let you know.
6   Q.   Please do.  Please do.
7   A.   I will.
8   Q.   And how long did he work with this finance
9   company?
10  A.   Up until the time we separated.
11  Q.   Okay.
12  A.   And beyond that, but...
13  Q.   Sure.  And during that time period, I take
14  it Tom would not have occasion to board any -- any
15  vessel?
16      MS. FISHER: Objection.  Form.
17  A.   No.  No.
18  Q.   And do you -- to your knowledge, did Tom
19  work around any asbestos during that time period?
20      MS. FISHER: Objection.  Form.
21  A.   Not to my knowledge.
22  Q.   Have you had any contact with Tom since
23  your diagnosis to determine whether he worked around
24  any asbestos?
25      MS. FISHER: Objection.  Form.

Page 63

1   A.   I contact him all the time.  But, you know,
2   that was never -- that never came up.
3   Q.   Okay.  So you haven't had occasion to ask
4   him that question, right?
5       MS. FISHER: Objection.  Asked and
6   answered.
7   A.   No.
8   Q.   Okay.  And how about your husband, have you
9   asked your husband whether or not he knows if he
10  worked around asbestos in any of his jobs?
11      MS. FISHER: Objection.  Form.
12  A.   I did.  And he said not to his knowledge.
13  Q.   And you have two children; is that correct?
14  A.   Yes.
15  Q.   Andrew Todd Arehart?
16  A.   Yes.
17  Q.   And what does he go by?
18  A.   Todd.
19  Q.   And he -- he lives in Virginia Beach?
20  A.   Yes.
21  Q.   Is he married?
22  A.   Divorced.
23  Q.   And when was he divorced?  Roughly.
24  A.   I don't know the exact date.
25  Q.   What was his wife's name?

Page 64

1   A.   Barbara.
2   Q.   And do you know her maiden name?
3   A.   I don't recall.
4   Q.   And did they have any children?
5   A.   One.
6   Q.   And what was the child's name?
7   A.   Brittany Anne.
8   Q.   When was she born?
9   A.   She's 15 now.
10  Q.   That's okay.  Okay.  Age -- age is fine.
11  A.   Okay.
12  Q.   And does she live with her father or with
13  her mother?
14  A.   She lives with her mother.
15  Q.   And she's not in any way financially
16  dependent upon you for support, you or your husband?
17      MS. FISHER: Objection.  Form.
18  A.   I certainly help her out financially.
19  Q.   Understood.
20      But, in other words, she's not dependent
21  upon you for -- to provide financial support for her?
22      MS. FISHER: Objection.  Form, asked
23  and answered.
24  A.   Well, I have an education fund set up for
25  her.

Page 65

1   Q.   Okay.  There are gifts that you give her --
2       MS. FISHER: Objection.  Form.
3   Q.   -- periodically; is that right?
4   A.   No.  It's --
5       MS. FISHER: Objection.  Form, asked
6   and answered.
7   Q.   I'm sorry.  Well, we can do it this way:
8   What financial support have you provided to her in
9   the last year?
10  A.   Aside from the trust fund for her
11  education, she would stay with me all summer when
12  school was out, which I never charged anything for.
13  I would take her -- she has a horse.  I would take
14  her to the stables every day in the summertime, which
15  was a round trip, two hours.  Of course, provided her
16  with purchases when she stayed with me all summer and
17  every other weekend.
18  Q.   Did you say "every other weekend"?
19  A.   Right.  My son gets her every other
20  weekend.
21  Q.   Does your son live with you?
22  A.   He lives close by.
23  Q.   Okay.  And does -- does he bring her by
24  every -- every other weekend by your house?
25  A.   He works in Virginia International

Page 66

1 Terminals. If he's working until 6:00 and doesn't
2 get home until 7:00, then Brittany will come to my
3 house and stay with me. If it's late, then he picks
4 her up the next day. So we share in taking care of
5 her when he does have her every other weekend.
6   Q.   Okay. Did you provide any money to her
7 mother to support Brittany?
8       MS. FISHER: Objection to form.
9   Q.   In the last five years?
10  A.   Well, out of her trust fund, $2,000 for her
11 braces.
12  Q.   Okay. Anything else?
13  A.   No. Everything else was clothes purchased
14 or things like that I made sure Brittany got
15 directly.
16  Q.   Yes. And the same question for Todd. Did
17 you provide Todd any money for Brittany in the last
18 five years other than the braces?
19  A.   Todd only clears $125 a week. He has rent
20 to pay. Every month I pay $500 for his rent, not to
21 mention paying off his credit card bill when it gets
22 too high.
23  Q.   Right. And — but you don't claim Todd as
24 a dependent on your tax returns, correct?
25  A.   No.

Page 67

1       MS. FISHER: Objection. Form.
2   Q.   And you don't claim Brittany as a dependent
3 on your tax return, correct?
4       MS. FISHER: Objection. Form.
5   A.   No.
6   Q.   Okay. Okay. But other than helping Todd
7 out, is there any money that you have given to Todd
8 specifically for Brittany?
9       MS. FISHER: Objection. Form, asked
10 and answered.
11  A.   I don't recall.
12  Q.   Okay. And you also have a daughter, Kim
13 Alexander Arehart?
14  A.   A male.
15  Q.   Oh, okay.
16  A.   It's a male.
17  Q.   And what does he go by?
18  A.   "Kim."
19  Q.   Okay. And he was born May 19th of 1961?
20  A.   Yes.
21  Q.   Todd was born February 27th of 1960?
22  A.   Right.
23  Q.   Is — well, let's finish up with Todd.
24      When did Todd move out of your family
25 residence? How old was he?

Page 68

1   A.   I want to say 18.
2   Q.   And after that time, did he have occasion
3 to move back into the family residence?
4   A.   No. I moved to Washington. And he
5 followed me there. And we bought him a townhouse.
6   Q.   Okay.
7   A.   It was really a condo. I'm sorry.
8   Q.   Who's the owner of that condo now?
9   A.   We've sold it.
10  Q.   When you say "we," was that you and your
11 husband or...
12  A.   Yes.
13  Q.   Okay. So the title of the condo remained
14 in your name and your husband's name, correct?
15      MS. FISHER: Objection.
16  A.   We formed some sort of partnership with
17 Todd, my husband and me, somehow so that we could get
18 the write-off, but it would still be his or whatever.
19  Q.   Okay. The — the proceeds from the sale of
20 that condo, did you — did you keep that or did Todd
21 get that?
22      MS. FISHER: Objection. Form.
23  A.   I don't recall.
24  Q.   When Todd lived in the family residence,
25 what was the first job that — where he was employed?

Page 69

1   A.   Okay. When he was 18, he moved out, so are
2 you talking about when he —
3   Q.   Yeah. Prior to — prior to when he was 18,
4 did —
5   A.   Oh, he went to military school. So he
6 didn't — you know, didn't have a job.
7   Q.   And what military school did he go to?
8   A.   It's in Portsmouth.
9   Q.   That's okay. If it comes —
10  A.   I can get the name for you, but it is in
11 Portsmouth.
12  Q.   Okay. If it comes to you later, just —
13 just let us know.
14  A.   Okay. It's on Frederick Boulevard. I know
15 that.
16  Q.   And is that a school — is that — is that
17 a full-time school where it's overnight and the —
18  A.   Full time.
19  Q.   Okay. And so you would just see Todd
20 occasionally on weekends or for visits or those types
21 of things; is that right?
22      MS. FISHER: Objection. Form.
23  A.   Right.
24  Q.   Okay. And as far as when he lived in the
25 family residence, he was never employed; is that

Page 70

1 correct?
2    A.  That's correct.
3    Q.  Okay.  Okay.  Let's move on to Kim.  And if
4 you'd like to take a break -- we've been going for a
5 an hour-and-a-half, if you would like to take a short
6 break, we can or --
7    A.  I would like to get it over with.
8        MS. KEYES:  We appreciate you checking
9 in with her, though.
10   Q.  We'll keep going then.
11   A.  If anybody else wants to, that's fine.
12       MR. STURM:  Anybody else?
13       We'll keep going.  Okay.
14   Q.  Kim, is Kim currently married?
15   A.  No.  He's divorced.
16   Q.  And when was he divorced, roughly?
17   A.  I -- I can't recall.  It's been awhile for
18 both of them.
19   Q.  And who was he married to?
20   A.  Karen.
21   Q.  Do you recall Karen's maiden name?
22   A.  Not right now.
23   Q.  And how long were they married?
24   A.  Probably about seven years.
25   Q.  Does Kim have any children?

Page 71

1    A.  He has one.
2    Q.  And that was with Karen; is that correct?
3    A.  Yes.
4    Q.  And what's the name of that child?
5    A.  Kristen Anne.
6    Q.  Arehart?
7    A.  Yes.
8    Q.  And how old is Kristen?
9    A.  Eighteen.
10   Q.  Where does she currently reside?
11   A.  With her mother.  In Virginia Beach.  In
12 Allenton.
13   Q.  And I forgot to ask you this about Todd.
14 How long was Todd married to Barbara?
15   A.  Approximately three years.
16   Q.  And Todd doesn't have any subsequent
17 marriages; is that right?
18   A.  No.
19   Q.  And does Kim have any other marriages other
20 than to Karen?
21   A.  No.
22   Q.  How frequently do you see Kristen?  Does
23 she go by Kristen or Kristen Anne?
24   A.  Kristen.
25   Q.  Kristen.

Page 72

1        How frequently do you see Kristen?
2    A.  I see her quite a bit because Brittany
3 comes every other weekend.  And Kristen now drives
4 and so she comes over to see me quite often; once,
5 twice a week.
6    Q.  Is Kristen still in school or has she
7 graduated?
8    A.  She's in her senior year.
9    Q.  What school does she attend?
10   A.  It's near her house.  I don't know if it's
11 Cox or -- I'm not sure which one it is right now.
12   Q.  And what type of custody arrangement does
13 Kim have?
14   A.  He sees her all the time anytime he wants
15 or she wants.  There's --
16   Q.  Is there -- but there's no -- there's no
17 formal court order?
18   A.  There might be a formal, but they don't
19 adhere to that because, you know...
20   Q.  Because she's old enough, she can decide
21 for herself?
22   A.  Yes.
23       MS. FISHER:  Objection.  Form.
24   Q.  And within the last five years, have you
25 provided any financial support to Kim, specifically

Page 73

1 for Kristen?
2        MS. FISHER:  Objection.  Form.
3    A.  I would say not directly.
4    Q.  How about to -- to Karen?
5        MS. FISHER:  Objection.  Form.
6    A.  No.
7    Q.  And I take it, do you also have some type
8 of college fund set up for her as well to help her
9 with college tuition?
10   A.  Yes.
11   Q.  And does she plan on going to college?
12   A.  Yes.
13   Q.  Do you know, where does she plan on going?
14   A.  Well, she's trying -- she's already
15 accepted a one, but she's trying for Virginia Tech
16 and -- I don't know if it's George Mason.  There were
17 just a couple that she preferred to go to and she's
18 waiting to hear from them.
19   Q.  Okay.  What does -- what does Kim do for a
20 living?
21   A.  He has his own business.
22   Q.  And what is that?
23   A.  It's Hudgins Interiors.  It's a decorating;
24 flooring, carpeting, tile.
25   Q.  And when did Kim move out of your family

Page 74

1  residence?
2    A.  The same time Todd did; 17, 18 time period.
3    Q.  And did -- did Kim also attend military
4  school?
5    A.  Yes.
6    Q.  And is it correct, then, that while he
7  lived in the family residence, he did not have any
8  employment; is that correct?
9        MS. FISHER: Objection. Form.
10   A.  Correct. And the military school was
11  Frederick.
12   Q.  Frederick?
13   A.  Military Academy.
14   Q.  And what are your parents' names? Or I'm
15  sorry. I already got your father, Rodney Mills.
16       What's your mother's name?
17   A.  You've got that, too. Eleanore.
18   Q.  And what is her maiden name?
19   A.  Masters.
20       MS. FISHER: Objection. Asked and
21  answered.
22   Q.  That's right.
23       When you were growing up in your family
24  household, did either your -- your brothers or your
25  mother or your father, did anyone smoke -- or you?

Page 75

1    A.  I don't smoke. My brothers didn't smoke.
2  My father might have smoked. And my mother did not.
3    Q.  Have you ever smoked?
4    A.  No.
5    Q.  And so your brothers never smoked, to your
6  knowledge?
7        MS. FISHER: Objection. Asked and
8  answered.
9    A.  Correct.
10   Q.  And why is it you say your father may have
11  smoked?
12       MS. FISHER: Objection. Form.
13   A.  Because I'm not -- I'm not sure. Just I
14  know that I'm sure about the others.
15   Q.  Okay. I want to go back to your family
16  residence, where you lived when you were a teenager
17  when your father worked at the shipyard.
18       Where was the -- where was the laundry
19  done?
20   A.  In the kitchen.
21   Q.  And can you describe for me, how big was
22  the -- well, can you describe for me the -- the first
23  floor of your house; approximately how big was that?
24   A.  When you're young, everything appears big,
25  but this was very small.

Page 76

1    Q.  How many -- how many rooms were on the
2  first floor?
3        MS. FISHER: Objection. Form.
4    A.  One, two, three -- four and a bath.
5    Q.  And so that would be a kitchen. Was there
6  a family room?
7    A.  A living room.
8    Q.  A living room.
9    A.  Two bedrooms.
10   Q.  Was there a dining room?
11   A.  No dining room. And a bath.
12   Q.  So it was a rancher; is that right?
13       MS. FISHER: Objection to form.
14   Q.  Or it was two floors?
15   A.  Yeah. It was a one-floor.
16   Q.  Okay. So there's -- there's a family room,
17  there was a kitchen, one bedroom?
18   A.  Two bedrooms.
19   Q.  Two bedrooms.
20       MS. FISHER: Objection.
21   Q.  Okay. And were there any other rooms other
22  than that?
23   A.  No.
24   Q.  And -- and there were times -- there were
25  occasions when you did laundry; is that right?

Page 77

1        MS. FISHER: Objection. Asked and
2  answered.
3    A.  Yes.
4    Q.  When did you first start helping out with
5  laundry?
6    A.  Well, when I was around 12, 13, I started
7  doing chores. And so I would say between 13 and 14.
8    Q.  And when you first started helping out --
9  helping out with the laundry, what specifically did
10  you do? Would you help fold? Would you help put the
11  clothes out? What would you -- what would you help
12  with?
13       MS. FISHER: Objection to form.
14   A.  A pile of dirty clothes, we would pick up
15  the clothes, shake them, check all the pockets to
16  make sure there was nothing in there. And then we
17  would put them in the washer, put in the soap powder
18  and wash them.
19   Q.  And would you shake all of the clothes?
20   A.  Yes. Because if they had dirt on them, we
21  didn't want to put that in the washing machine.
22   Q.  Would you only shake clothes that had dirt
23  on them?
24       MS. FISHER: Objection to form.
25   A.  No.

Page 78

1    Q.   Or would you shake all of them?
2    A.   *Just shake them all.
3         MR. STURM:  And I'm sorry.  Could you
4    read back that answer?
5         (*ANSWER READ.)
6    Q.   Okay.  Okay.  So even the clean clothes you
7    would shake out?
8         MS. FISHER:  Objection.  Asked and
9    answered.
10   Q.   Even the ones that weren't dirty, you would
11   shake out --
12        MS. FISHER:  Objection.  Asked and
13   answered.
14   Q.   -- reasonably dirty?
15   A.   All the clothes were dirty.
16   Q.   Um-hum.
17   A.   Had no way of knowing what was in
18   pockets --
19   Q.   Um-hum.
20   A.   -- in the cuffs, so we would shake them and
21   put them — you know, check the pockets and then put
22   them in the washer.
23   Q.   Okay.  Now, some of the clothes you would
24   look at and you couldn't — if they weren't covered
25   with dirt, you couldn't tell they were dirty, right?

Page 79

1         MS. FISHER:  Objection.  Form.
2    A.   Just a normal routine was just picking up
3    each piece of clothing, shaking it, checking it and
4    putting it in the washer.
5    Q.   Okay.  So you would shake clothes that
6    didn't appear to have dust or debris on it?  You
7    would shake that as part of your routine; is that
8    right?
9         MS. FISHER:  Objection.  Asked and
10   answered.
11   A.   I would shake and straighten out everything
12   that I put in.
13   Q.   Okay.  The clothes that were dusty, that
14   had dust or dirt on them, whose clothes were they?
15   Do you recall whose clothes had dust or dirt on them?
16   A.   They all had dirt on them.  Some were
17   dirty -- you can't see the dirt, but they're dirty
18   because they had been worn.
19   Q.   Okay.
20   A.   Dusty, more than likely, were the work
21   clothes.
22   Q.   As you think back to when you were a
23   teenager, are you able to recall whether — well,
24   strike that.
25        When you were a teenager and you were doing

Page 80

1    the laundry, do you recall the condition of clothes
2    that you believe your father wore to the shipyard?
3         MS. FISHER:  Objection.  Asked and
4    answered.
5    A.   Do I recall the condition of the clothes?
6    Q.   Yes.
7    A.   They were more noticeably dusty or white
8    or -- or had, you know, obvious dirt or something on
9    them than my brothers' clothes had.
10   Q.   Okay.  So thinking back to the time when
11   you were a teenager, can you tell me what the dust or
12   dirt, what it looked like on your father's clothing?
13   A.   It was just kind of light dust, milky; you
14   know, light rather than black.
15   Q.   Okay.  So you recall there being a
16   light-colored dust on your father's clothing from the
17   time when -- when you were a teenager and your father
18   was working at the shipyard; is that right?
19   A.   Yes.
20   Q.   Okay.  And there were time periods when you
21   were doing your father's laundry when he didn't work
22   at the shipyard, right?
23   A.   Yes.
24   Q.   Okay.  And those clothes -- do you recall
25   if those clothes had any dust or dirt on them?

Page 81

1         MS. FISHER:  Objection to form.
2    A.   A lot of those had grease.
3    Q.   Okay.
4    A.   You know.
5    Q.   And when there was dust or dirt on these
6    clothes, would you shake them out in the kitchen or
7    would you take them outside and shake them out?
8         MS. KEYES:  Objection to form.
9         MS. FISHER:  Objection to form.
10   A.   Unfortunately, I would just shake them
11   right where I stood.
12   Q.   Okay.  Is that what your mother did, also?
13   Is that what she taught you to do?
14        MS. FISHER:  Objection.
15   A.   I don't recall how she did them.
16   Q.   Okay.  Are you able to estimate for me the
17   number of times that you recall shaking out clothes
18   that were dusty during the one or two years that your
19   father worked at the shipyard?
20        MS. FISHER:  Objection to form.
21   A.   I can't estimate how many times.
22   Q.   Okay.  Are you able to say if it was more
23   or less than ten times that you specifically recall
24   doing that?
25        MS. FISHER:  Objection.  Form.

Page 82

1    A.  More than ten times, but I can't tell you
2  how many.
3    Q.  Okay.  When you shook the dust, you
4  wouldn't shake the dust at your face, you would shake
5  it away from your body; is that right?
6         MS. FISHER:  Objection to form.
7    A.  Up and down.
8    Q.  Okay.  Would you hold it close to your body
9  or would you hold it away from your body when you
10 shook the clothes?
11        MS. FISHER:  Objection to form.
12   A.  I don't know.  Arm's length, you know, but
13 in front of me.  I didn't --
14   Q.  Okay.
15   A.  -- pay attention to -- to that.
16   Q.  So you would extend your arms at arm's
17 length and shake the clothes, right?
18        MS. FISHER:  Objection.  Asked and
19 answered.
20   A.  Bent arms.
21   Q.  Okay.  Would you ever brush the -- brush
22 any dust or debris off the clothing?
23        MS. FISHER:  Objection to form.
24   A.  I'm sure I did if it was more obvious than
25 not.

Page 83

1    Q.  Is it a fair statement that while your
2  father worked at the shipyard, that the times that
3  you did his laundry, there were occasions when his --
4  his clothing was not dusty or dirty?
5         MS. FISHER:  Objection.  Form.
6    A.  I don't recall that.
7    Q.  Okay.  Are you able to testify here today
8  under oath that every time that you did his laundry
9  while he worked at the shipyard that that laundry had
10 dust or debris on it?
11        MS. FISHER:  Objection.  Form.
12   A.  I don't recall.
13   Q.  Okay.  Did you ever see your mother take
14 the clothes outside and shake them out?
15        MS. FISHER:  Objection.  Form, asked
16 and answered.
17   ·A.  I don't recall.
18   Q.  Did you ever see your mother take the
19 clothes and brush the clothes as opposed to shaking
20 them?
21        MS. FISHER:  Objection to form.
22   A.  I don't recall.
23   Q.  Did you ever see your father dust off his
24 clothes or shake his own clothes out?
25   A.  Never.

Page 84

1    Q.  When you shook the clothes out, I take it
2  it was one of your objectives to not shake the dust
3  and debris on yourself; is that a fair statement?
4         MS. FISHER:  Objection to form.  Asked
5  and answered.
6    A.  I didn't think about what I was shaking or
7  doing other than to shake as much dust or dirt off of
8  the clothes to put them in the washer.  So I wasn't
9  paying attention to whether I, you know, was trying
10 to avoid getting it on me.  I -- you know...
11   Q.  So are you saying that you didn't mind
12 getting dust and debris all over yourself when you
13 were doing the laundry?
14        MS. FISHER:  Objection to form.
15   A.  No, I'm not saying that.
16   Q.  Okay.  So do you recall one way or another
17 whether or not you would try not to get the dust or
18 debris on yourself --
19        MS. FISHER:  Objection.  Asked and
20 answered.
21   Q.  -- when -- let me finish.
22      -- when you would shake the clothes out?
23        MS. FISHER:  Objection.  Asked and
24 answered.
25   A.  No, I don't recall.

Page 85

1    Q.  Okay.  Do you recall if during the year or
2  two that your father worked at the shipyard whether
3  or not he was ever laid off for any period of time?
4    A.  I don't recall.
5    (MS. KEYES EXITS THE CONFERENCE ROOM.)
6    Q.  And, again, as you testified previously --
7  Well, strike that.
8      Do you recall how your father brought home
9  his work clothes?
10        MS. FISHER:  Objection to form.
11   A.  No.
12   Q.  Whether he wore them or carried them?
13   A.  No, I don't.
14   Q.  And you can't give me a description of what
15 any of those work clothes looked like?
16        MS. FISHER:  Objection.  Asked and
17 answered.
18   Q.  Correct?
19   A.  Correct.
20   Q.  Is it a fair statement that since your
21 mother was disabled at the time, that she did the
22 lion's share of the laundry?
23        MS. FISHER:  Objection.  Asked and
24 answered.
25   A.  Not necessarily.

Page 86

1  Q. Okay. Given that you were in school and
2  that you had a part-time job, is it a fair
3  statement -- and your mother was home all day, based
4  on that, do you believe that your mother did most of
5  the laundry?
6  A. I don't know what year she went out on
7  disability, so that -- to me, having her home all day
8  was not true because I don't recall coming home and
9  finding her there.
10  Q. Okay. Unfortunately, we don't have your
11  mother's disability records, so we're not able to say
12  exactly when -- when she was on disability.
13  (MS. KEYES ENTERS THE CONFERENCE ROOM.)
14  A. I don't have that either.
15  Q. Okay. But would you agree with me that
16  once your mother was on disability that the lion's
17  share of the laundry responsibilities were your
18  mother's?
19  MS. FISHER: Objection. Asked and
20  answered.
21  A. All I recall is that we shared washing the
22  clothes and doing other chores. Now, I can't say
23  whether she did the majority, I did the majority, you
24  know.
25  Q. Okay. Did your father ever tell you

Page 87

1  anything about his work at the shipyard?
2  A. No.
3  Q. So I take it, then, you don't have any
4  information regarding the types of products or
5  equipment that he either worked with or around?
6  MS. FISHER: Objection. Form.
7  Q. Is that correct?
8  A. No. Other than the title of the --
9  Q. Of his position?
10  A. -- of the job. Correct.
11  Q. Sure.
12  Or for that matter, the brand names, the
13  manufacturers or the suppliers of the products or
14  equipment that he worked with or around; is that
15  right?
16  MS. FISHER: Objection. Form.
17  A. No.
18  Q. And you're not able to provide any names of
19  any ships that your father worked on; is that
20  correct?
21  A. Correct.
22  Q. Or how long he worked on those ships, the
23  products he was working with on those ships, the
24  areas of the ships where he worked, you're not able
25  to provide any of that information, correct?

Page 88

1  MS. FISHER: Objection. Form.
2  A. No.
3  Q. Did you ever hear your father tell anyone
4  else about those types of details about his work?
5  A. No.
6  MS. FISHER: Objection to form.
7  Q. And you're not able to testify whether your
8  father's work involved repair, overhaul or new
9  construction work --
10  MS. FISHER: Objection to form.
11  Q. -- on vessels?
12  A. No.
13  Q. Do you know other than -- do you know
14  whether your -- your father worked on ships or if he
15  had other responsibilities such as working in
16  workshops? Do you have any idea on that?
17  A. No.
18  MS. FISHER: Objection. Asked and
19  answered.
20  Q. And I take it, then, you don't know if your
21  father ever worked on an overhaul of any type of --
22  of any type of sea vessel, do you?
23  MS. FISHER: Objection. Asked and
24  answered.
25  A. No.

Page 89

1  Q. Or if your father ever worked on or around
2  work on a turbine or generator?
3  MS. FISHER: Objection. Asked and
4  answered.
5  A. No.
6  Q. Or -- or if your father was around others
7  who were doing such work?
8  A. No.
9  Q. And I take it you -- you've never
10  personally had any contact with any representative of
11  General Electric Company; is that a fair statement?
12  MS. FISHER: Objection to form.
13  A. Yes, I have not.
14  Q. Okay. How about your father?
15  MS. FISHER: Objection to form.
16  A. Not to my knowledge.
17  Q. And I take it you -- you have not had any
18  occasion to review any manuals relating to any
19  General Electric products?
20  A. No.
21  Q. And how about your father, do you know if
22  your father ever reviewed any?
23  A. I have no idea.
24  MS. FISHER: Objection to form.
25  Q. During the course of your lifetime, have

1 you seen any products that were manufactured by
2 General Electric that you associate in any way with
3 asbestos?
4          MS. FISHER: Objection to form.
5     A. I don't know what products are associated
6 with General Electric.
7     Q. Okay. And is it a fair statement that to
8 your knowledge, you were not exposed to any asbestos
9 dust originating from any GE product during your
10 lifetime?
11         MS. FISHER: Objection. Objection to
12 form.
13    A. I have no knowledge.
14    Q. Okay. Or from any product for which
15 General Electric was responsible for?
16         MS. FISHER: Objection to form.
17    A. Since I don't know what products are
18 related to General Electric, I -- I have no idea
19 then.
20    Q. Okay. The -- there were some work
21 history -- you've seen the work history sheets that
22 were provided, correct?
23    A. Yes.
24    Q. And the -- I take it you did not -- you did
25 not type those work history sheets; is that right?

1          MS. FISHER: Objection.
2 Attorney-client privilege.
3          MS. KEYES: You can answer the
4 question.
5          MS. FISHER: You can answer.
6          MR. BURNS: Would anybody strenuously
7 object to a check-the-plumbing break?
8          MS. KEYES: No, that's fine. Do you
9 want her to answer the pending question?
10         MR. BURNS: Oh, I'm sorry.
11         MS. KEYES: That's cool.
12    A. Yeah. Could I see what the form is and
13 maybe it would --
14    Q. Sure. Do you recognize that? If -- if I
15 can have it back, because there's --
16    A. Okay.
17    Q. I have some notes on the other pages,
18 but --
19    A. Oh, okay.
20         MR. BURNS: I have a clean copy if you
21 want.
22         MR. STURM: Okay.
23    Q. Do you recognize that? Do you need to see
24 the whole document?
25         I'll tell you what, why don't we take a

1 break?
2     A. Okay.
3     Q. And I'll -- I'll -- during the course of
4 the break, I'll give it to you.
5     A. I just want to be sure I give you the right
6 answer.
7     Q. Okay. Perfectly fine.
8          MR. STURM: Let's take a break.
9 Thanks.
10         (RECESS.)
11 (DEFENDANTS EXHIBIT NO. 1 MARKED FOR IDENTIFICATION.)
12 BY MR. STURM:
13    Q. Ms. Anderson, we're back after a break.
14    Q. During -- during the break, did you talk to
15 your attorneys at all about the substance of your
16 testimony?
17         MS. FISHER: Objection.
18 Attorney-client privilege.
19         You don't need to answer that.
20    Q. Okay. Ms. Anderson, for the -- for the
21 record, you're -- you're not going to answer that
22 question based on the instruction of counsel,
23 correct?
24    A. Right.
25    Q. Okay. I'm handing you what's marked as

1 Defendants Exhibit No. 1, and I think you've probably
2 took a look at this during the course of the break.
3 These are the work history sheets that I was asking
4 you about before the break.
5     A. Right.
6     Q. Have you seen those before?
7     A. Yes.
8     Q. Okay. When -- when have you reviewed
9 those?
10    A. After I gave them information.
11         MS. KEYES: And then we'll just
12 instruct you not to discuss the content of any
13 information that you may have --
14         THE WITNESS: Okay.
15         MS. KEYES: -- given to us or any of
16 our communications.
17         THE WITNESS: Okay. All right.
18    Q. Okay. The information in the work history
19 sheets came from you.
20    A. Right.
21    Q. Are you -- are you aware of any other --
22 did they -- are you aware of any other source from
23 which this information came?
24    A. No.
25    Q. Okay. Starting with the work history sheet

Page 94

1 that's titled — the first page is titled "Rodney
2 Bailey Mills," your — your father's work history
3 sheet. And this is for the — it's the Portsmouth
4 Naval Shipyard.
5         First, is the Portsmouth Naval Shipyard, is
6 that how the shipyard was known to you?
7              MS. FISHER: Objection. Asked and
8 answered.
9    A.   As far as I remember.
10   Q.   Okay. And it says here that the date of
11 the job was nine years from '47 to '56. And you've
12 testified here today under oath that he worked there
13 for approximately one to two years.
14             MS. FISHER: Objection to form. Is
15 that a question?
16   A.   Can I answer or —
17             MS. KEYES: Yes.
18   A.   Okay. Filling out that form, that was the
19 best of my knowledge. Trying to narrow it down, you
20 know, with age and so forth, what I said today seems
21 to be, you know, the most accurate.
22   Q.   Okay. Thank you. That was — that was my
23 question.
24        Then there's an exhibit — Exhibit A that's
25 attached — it's the second page. And this

Page 95

1 represents, according to the sheet, exposures that
2 occurred at job sites. And there's a list of product
3 manufacturers that are listed here. I take it —
4        And you've seen this, right, page 2?
5             MS. FISHER: David, I should ask, is
6 the whole document a clean copy?
7             MR. STURM: Yes.
8             MS. FISHER: Okay. Thanks.
9    A.   Now, would you repeat your — your question
10 on this?
11   Q.   Well, I was — I hadn't asked you —
12 actually asked you a question.
13        But referring you to page 2 —
14   A.   Um-hum.
15   Q.   — there's a list of product manufacturers
16 there. I take it that none of those products or that
17 information on that page came from you, correct?
18   A.   Correct.
19   Q.   Okay. And the remainder of the work
20 history sheets, do those represent the employment
21 where you believe that you were exposed to asbestos?
22             (PAUSE.)
23   A.   I would say yes.
24   Q.   Okay.
25   A.   But that was to my knowledge.

Page 96

1    Q.   Okay. The —
2    A.   You know, it could have been --
3    Q.   The — the information that's contained in
4 the remainder of these sheets, does that -- did that
5 information come from you?
6             MS. KEYES: Objection.
7             MS. FISHER: Objection.
8    Q.   Okay. I'll rephrase it. I'll rephrase it.
9        You've identified joint compound as the
10 source of exposure in these -- in the remaining
11 sheets.
12       Did that information come from you? Did
13 you believe you were exposed to joint compound at
14 these sites?
15             MS. FISHER: Objection.
16 Attorney-client privilege.
17             MS. KEYES: David, if you could -- I
18 mean, I -- I'm not going to ask you how to ask the
19 question; but if you could ask her does she believe
20 that she was exposed rather than, you know --
21             MR. STURM: Well, either way, I mean,
22 fine. We can -- we'll come back to it.
23             MS. KEYES: Okay.
24    Q.   Why don't we -- now is probably a good time
25 for us to go through your work history.

Page 97

1    A.   Um-hum.
2    Q.   After you moved out of your residence, you
3 went and for two years you worked as an x-ray
4 technician, correct?
5    A.   Um-hum.
6    Q.   Part of that was a school environment where
7 they were teaching you the trade of working as an
8 x-ray technician, correct?
9             MS. FISHER: Objection. Asked and
10 answered.
11   A.   Yes.
12   Q.   Okay. And as part of that school, were you
13 in an environment where there was radiation going on
14 on an ongoing basis?
15             MS. FISHER: Objection. Form.
16       You can answer.
17   A.   Yes.
18   Q.   Okay. And can you describe for me how
19 that -- how that program worked, what your duties
20 were, what percentage of your time you were in school
21 versus actually working in the field?
22   A.   When you say "working in the field," the --
23   Q.   In the hospital?
24   A.   The training was a hand-on training and the
25 work that the x-ray technicians did was to take

Page 98

1  x-rays for different problems that people had.
2     Q.  So when you started out, did you start
3  out -- did you start out working with people who were
4  taking x-rays?
5     A.  Originally.
6     Q.  Okay.  Okay.  And what other duties did you
7  have aside from assisting with that?
8     A.  Well, just certain classes we'd go to.  So
9  part of the day would be class, part of the day would
10  be, you know, performing x-ray and also developing
11  x-rays.
12    Q.  And were you taking classes the whole time
13  or did you only take classes for a period of a few
14  months, or how did that work?
15       MS. FISHER:  Objection.  Form.
16    A.  Just part time.
17    Q.  Okay.  Do you recall how long the classes
18  lasted?
19    A.  No.  They weren't long.
20    Q.  Did -- did you have classes for the entire
21  two years or did they stop after a period of time?
22       MS. FISHER:  Objection to form.
23    A.  No.  They were just, you know, part of the
24  time; and the rest of the time, we took x-rays.
25    Q.  Okay.  Is it a fair statement, then, the

Page 99

1  majority of your time was involved taking x-rays and
2  then developing them; is that right?
3       MS. FISHER:  Objection to form.
4     A.  I would say yes.
5     Q.  Okay.  And did you take any precautions
6  when you were involved in taking x-rays?
7     A.  Sure.
8       MS. FISHER:  Objection to form.
9     Q.  Okay.
10    A.  Sure.
11    Q.  Okay.  What precautions did you take?
12    A.  We wore lead aprons and we always stayed
13  behind the lead-enclosed partitions before we exposed
14  any x-ray.
15    Q.  In -- are you able to provide for me how
16  many x-rays you would have been involved in taking
17  per day?
18       MS. FISHER:  Objection to form.
19    Q.  Approximately?
20    A.  No.
21    Q.  Was it pretty consistent that you would
22  have at least -- at least a couple each day?
23       MS. FISHER:  Objection.  Asked and
24  answered.
25    Q.  In terms of x-rays that needed to be taken?

Page 100

1     A.  At least a couple each day?
2     Q.  Um-hum.
3     A.  Sure.
4     Q.  Okay.  And did you work -- where in the
5  hospital did you work?  Was that in the radiology
6  department?
7     A.  Yes.
8     Q.  Okay.  And that's a restricted area?
9       MS. FISHER:  Objection to form.
10    A.  Not necessarily restricted.
11    Q.  Okay.
12    A.  It's next to the emergency room.
13    Q.  After working at DePaul Hospital, what was
14  your next job?  It says on your answers to
15  interrogatories, it says Owens-Illinois factory
16  worker at a bottling plant, and that was in
17  Charleston from 1960 to 1961?
18    A.  Well, it was in the '60s.  I don't remember
19  the exact date because towards the end of the year,
20  you know, I started working -- I went back to
21  Virginia.  But it started in '60.
22    Q.  Okay.  And that was the next job you had
23  after working as an x-ray tech --
24    A.  Right.
25    Q.  -- at DePaul Hospital?

Page 101

1       The -- this bottling plant, do you recall
2  where in Charleston it was located?
3     A.  It was on the Kanawha River right close
4  to -- close to the capital.  I just remember going
5  across the bridge on the other side of the river.
6  And it didn't take me a lot of time to get there.
7     Q.  And where in the -- in the bottling
8  facility did you work?
9     A.  The plant is an open plant, so the lower
10  levels were open to the upper levels.  The lower
11  levels had bottles that were coming off conveyor
12  belts.  The upper levels had cartons that were made
13  and stapled for the bottles to go into.  So I worked
14  on the upper level.
15    Q.  So you worked around the boxes?
16       MS. FISHER:  Objection.  Form.
17    Q.  The boxing portion of the assembly, right?
18    A.  Yes.
19    Q.  Did you work in any other areas of the
20  facility?
21    A.  No.
22    Q.  Do you recall any maintenance of machinery
23  that was going on around you at this facility?
24       MS. FISHER:  Objection to form.
25    A.  I don't recall.

1    Q.  Do you ever recall any -- seeing any
2    insulation at this facility?
3          MS. FISHER: Objection. Form.
4    A.  I don't recall.
5    Q.  What was being bottled?
6    A.  To my knowledge, nothing. They were just
7    putting the bottles in the boxes and providing them
8    to whatever company, you know, that used the bottles.
9    Q.  Do you know, were the bottles empty or was
10   there something in the bottles?
11   A.  To my knowledge, they were empty.
12   Q.  Okay. And do you recall any type of
13   construction work taking place at this facility while
14   you worked there?
15         MS. FISHER: Objection. Asked and
16   answered.
17   A.  I don't recall any.
18   Q.  And let's see, after you finished working
19   at -- after you left Owens-Illinois, you went to --
20   you went back to Norfolk; is that right?
21   A.  Yes.
22   Q.  And do you recall where you worked at that
23   time?
24   A.  It seems like the next place I worked was
25   with the government after that.

1    Q.  Okay. And was that --
2    A.  The Fifth Naval District, is that the --
3    Q.  Yes.
4    A.  Yes.
5    Q.  As a telephone operator?
6    A.  Right. To get into the government, I took
7    a part-time job as a telephone operator -- or a
8    temporary job.
9    Q.  And where was that located? Was that
10   located on base?
11   A.  Yes.
12   Q.  And was that the Norfolk Naval Base?
13   A.  Yes.
14   Q.  The same one where your father had worked?
15   A.  No.
16   Q.  What was -- how was that -- how was that
17   referred to compared to what -- the place where your
18   father worked?
19         MS. FISHER: Objection to form.
20   Q.  What's the difference there?
21   A.  In Norfolk, you have Norfolk and Portsmouth
22   and you have military facilities all over the place.
23         The one I originally worked at was like the
24   Naval Air Station. CINCLANT Fleet that I worked at
25   later was down Hampton Boulevard, so they are

1    different locations.
2    Q.  Okay. Okay. So what's listed here as
3    Headquarters, Fifth Naval District, that is -- that's
4    an air station; is that right?
5    A.  Yes.
6    Q.  Okay. And so there's no -- there's no ship
7    work taking place at that -- at that site?
8    A.  No. No.
9    Q.  Okay. That was a temporary position; is
10   that right?
11   A.  Yes.
12   Q.  The dates listed here are '62 to '63. Does
13   that sound right to you?
14   A.  Yes. Because it was like a 90-day
15   position, and then I found a permanent one after
16   that.
17   Q.  Okay. And what was the permanent position?
18   A.  I believe it was Oceana.
19   Q.  That's what is indicated in your
20   answers to interrogatories.
21   A.  Um-hum.
22   Q.  And it says from 1963 to 1967, you were a
23   telephone operator supply clerk; is that -- is that
24   correct?
25   A.  Yes.

1    Q.  And I want to go back to the telephone
2    operator position, the temporary position. That
3    was -- and you worked in an office; is that right?
4    A.  Yes.
5    Q.  Okay. And do you recall any -- any type of
6    maintenance work occurring around -- well, strike
7    that.
8          Do you recall any type of construction work
9    occurring around you?
10   A.  I don't recall any at that time.
11   Q.  Okay. Do you recall seeing any equipment
12   being maintained or repaired around you?
13         MS. FISHER: Objection to form.
14   A.  I don't recall.
15   Q.  Moving on to the Oceana position,
16   did you start there as a telephone operator?
17   A.  Yes.
18   Q.  And that was an office job?
19   A.  Yes. It was in the main headquarters.
20   Q.  Okay. The Oceana, that's a -- that's an
21   air station. There isn't any ship work going on,
22   right?
23   A.  No.
24         MS. FISHER: Objection to form.
25   Q.  The -- do you recall -- how long did you

Page 106

1 work as a telephone operator?
2   A.  I would say close to a year and then got
3 promoted to supply.
4   Q.  And during that year as a telephone
5 operator, do you recall any construction work going
6 on around you?
7     MS. FISHER: Objection. Form.
8   A.  I -- I -- I can't recall.
9   Q.  And what were your duties as supply clerk?
10   A.  Maintaining records of supplies that were
11 issued and received and --
12   Q.  And was that also an office job?
13   A.  Yes.
14   Q.  Do you recall any construction work
15 occurring around you?
16     MS. FISHER: Objection to form.
17   A.  In trying to recall any construction, there
18 was always some sort of construction going on. And
19 so I -- I can only tell you that I recall it being
20 done, you know, at a lot of different places that I
21 worked at in the government, but I can't tell you
22 specifically which location.
23   Q.  Okay. You could say specifically that with
24 respect to the Fifth Naval District position that you
25 didn't recall any construction work going on around

Page 107

1 you, right?
2     MS. FISHER: Objection to form.
3   A.  I can only say I don't recall it.
4   Q.  Okay. How about Oceana, are you able to
5 say whether or not that occurred at Oceana?
6     MS. FISHER: Objection. Asked and
7 answered.
8   A.  All I remember are partitions being put up
9 and that type of work being done at a lot of the
10 places I did work, but I don't know which ones
11 specifically. It wasn't important to me at the time.
12   Q.  Do you recall what the partitions were made
13 out of and --
14     MS. FISHER: Objection. Form.
15   A.  I don't know. Two-by-fours, drywall and
16 then -- then the -- the mud they used and --
17   Q.  And I don't want to mischaracterize your
18 testimony, so correct me if I'm wrong. But if I'm
19 understanding your testimony correctly, you're saying
20 that there were places where you recall that work
21 occurring, but you're not able to say that it
22 specifically occurred at the Oceana Air Station while
23 you worked there; is that right?
24     MS. FISHER: Objection. Form.
25   A.  Right. It was always just a given: A new

Page 108

1 person would come in, an organization changed.
2 They'd -- they'd make more cubicles for people. You
3 know, it just -- it was just a normal thing that you
4 wouldn't pay attention to. So I don't know whether
5 it was one place or the other or all of them.
6   Q.  Okay. Do you recall seeing any equipment
7 being repaired or maintained?
8     MS. FISHER: Objection. Form.
9   A.  I don't -- don't recall.
10   Q.  Okay. And how long did you work as a
11 supply clerk?
12   A.  Until I left Oceana and went to Dam Neck.
13   Q.  Do you have an approximation how long that
14 was?
15   A.  Well, I know it's on the form.
16   Q.  When you -- when you came up with the
17 information that's in the interrogatory answers, were
18 you referring to something else?
19     MS. FISHER: Objection. Form.
20   Q.  Any other documents?
21   A.  I was referring to dates that I was
22 employed at these organizations. So what I provided
23 you with is -- you know, is how long I worked at
24 Oceana as a supply clerk.
25   Q.  It's from your Social Security records; is

Page 109

1 that right?
2     MS. FISHER: Objection to form.
3   Q.  It that what you're looking at?
4   A.  Yeah. Or I would have personnel actions or
5 things that I would keep a record of every time I
6 moved from one job to the next.
7   Q.  Okay. And do you have -- do you have notes
8 at your house about that or records at your house --
9     MS. FISHER: Objection. Form.
10   Q.  -- that relate to that?
11   A.  I have -- I have my work records.
12   Q.  And what do those consist of?
13   A.  The date --
14     MS. FISHER: Objection. Form.
15   A.  -- the date I started, the date I went to
16 the next job and the job title that I had.
17   Q.  Okay. And those -- did those come to you
18 from the military? Did the military provide you
19 that?
20     MS. FISHER: Objection --
21   A.  Civil --
22     MS. FISHER: -- to form.
23   A.  Civil Service.
24   Q.  Okay.
25     MR. STURM: I would just ask that we

Page 114

1  it? Is there anything about that that's confusing to
2  you?
3      A.   When you ask about equipment, I just try to
4  think of any kind of equipment --
5      Q.   Okay.
6      A.   -- you know.
7      Q.   And that's -- that's what I'm asking.
8      A.   And I -- I don't recall, you know.
9      Q.   Okay.  All right.  The next job I have
10  listed for you is the Human Resource Management
11  Center on Tidewater Drive?
12      A.   Yes.
13      Q.   From '75 to '76; is that correct?
14      A.   Um-hum.
15      Q.   And you worked in the financial office
16  there?
17      A.   Yes.
18      Q.   And what was your title?
19      A.   It should have been budget analyst.
20      Q.   Okay.  Yeah, budget and accounting analyst
21  is what's listed.
22      A.   Um-hum.
23      Q.   And what were your duties there?
24      A.   Maintaining the books and budgeting.
25      Q.   And so that was an office job and you

Page 115

1  weren't required to -- to leave the office as part of
2  your duties; is that correct?
3      A.   Correct.
4      Q.   And do you recall any construction work
5  going on at that location?
6          MS. FISHER: Objection to form.
7      A.   I recall there being partitions, you know,
8  put up.  But I don't recall specifically, you know,
9  if that was -- you know, it's just -- it's so vague
10  to me.
11      Q.   And what were those partitions made out of?
12  Were those temporary partitions or permanent?
13          MS. FISHER: Objection to form.
14      A.   Well, whenever they made partitions, I'm
15  speaking of, you know, drywall, framing, you know,
16  subdividing, that type of thing.  The other
17  partitions are just movable.
18      (MS. KEYES EXITS THE CONFERENCE ROOM.)
19      Q.   Okay.  Do you recall seeing any equipment
20  being maintained or repaired at that facility?
21          MS. FISHER: Objection. Form.
22      A.   I don't recall.
23      Q.   And the next site I have listed for you is
24  the CINC Atlanta --
25      A.   CINCLANT Fleets.

Page 116

1      Q.   CINCLANT Fleet.
2      A.   Commander in Chief Atlantic Fleet.
3      Q.   And how long did you work at the -- at that
4  site?  It only has 1976 listed.
5      A.   The job following that, was that also in
6  CINCLANT Fleet --
7      Q.   It says --
8      A.   -- in supply?
9      Q.   -- Civil Engineer Departments, Naval
10  Station.
11      A.   Okay.  Well, I probably worked in the
12  CINCLANT Fleet almost a year and then got promoted to
13  go to the staff civil engineer's office.
14      Q.   Okay.  And at the CINCLANT Fleet, do you
15  recall any construction work taking place?
16          MS. FISHER: Objection to form.
17          You can answer.
18      A.   Well, they were really old buildings.  And,
19  as I say, I always saw things going on.  But, you
20  know, other than vaguely remembering these things, I
21  can't be specific any more than that.
22      (MS. KEYS ENTERS THE CONFERENCE ROOM.)
23      Q.   And do you -- do you recall whether you saw
24  any equipment being maintained or repaired --
25          MS. FISHER: Objection to form.

Page 117

1      Q.   -- at that site?
2      A.   No, I don't recall.
3      Q.   Moving on to the civil engineering
4  department, was that the next job you had?
5      A.   Yes.
6      Q.   And it says here that you worked there from
7  1976 to 1978 as a supervisory budget analyst.  Does
8  that sound correct?
9      A.   Yes.
10      Q.   And that was an office job?
11      A.   Yes.
12      Q.   And you weren't required to go other places
13  as part of that job?
14      A.   No.
15      Q.   And do you recall any construction work
16  taking place at that facility?
17      A.   No, I don't recall.
18      Q.   Do you recall seeing any equipment being
19  maintained or repaired at that facility?
20      A.   I don't recall.
21      Q.   The next -- next job I have listed here is
22  with the Atlantic Fleet Headquarters Support,
23  Financial Office from 1978 to 1980 as a budget and
24  accounting analyst.  Is that -- is that correct?
25      A.   Yes.

Page 118

1     Q.   Okay. Was that consistent with your --
2   your memory?
3     A.   Yes.
4     Q.   Okay. And was that an office job?
5     A.   Yes.
6     Q.   And you weren't required to go other places
7   as part of that job?
8     A.   No.
9     Q.   Do you recall seeing any construction work
10   at that site?
11     A.   Well, it's a part of the CINCLANT Fleet
12   compound; same thing, old buildings. And, you know,
13   I recall things being done; but, you know, I can't be
14   any more specific than that.
15     Q.   Okay. When you say recall -- you recall
16   things being done, you can't give me any more detail
17   than that?
18     A.   No. Just the same type of thing I had
19   mentioned before. Work in civil service, you worked
20   in a lot of old buildings at that time and they all,
21   just as a given, had things going on. And, you know,
22   I -- I -- it wasn't real important to me at that time
23   to have to pay attention to what other people were
24   doing.
25     Q.   Do you recall any equipment being

Page 119

1   maintained or repaired at that site?
2     A.   I -- I don't recall.
3     Q.   The next facility listed -- strike that.
4          The next job listed here is the civil
5   service from 1980 to 1985 in Washington, DC, as an
6   accounting or budget analyst.
7          Is that -- is that consistent with your
8   memory as far as your employment?
9     A.   Yes.
10     Q.   And that was an office job?
11     A.   Yes.
12     Q.   And you weren't required to go work at
13   other locations as part of that job?
14     A.   No.
15     Q.   And do you recall any construction work
16   going on at that facility?
17     A.   I -- I don't recall.
18     Q.   Do you recall any equipment being
19   maintained or repaired at that facility?
20     A.   No, I don't recall.
21     Q.   The next job I have listed here is the
22   Captain Quarters Resort Hotel. That's the hotel that
23   you -- you owned, correct?
24     A.   Yes.
25     Q.   1985 to 2000, is that consistent with your

Page 120

1   memory?
2     A.   Yes.
3     Q.   And you were the -- you were the GM. You
4   were calling the shots there, right?
5     A.   (Witness moves head up and down.)
6          MS. FISHER: Objection to form.
7     Q.   Yes?
8     A.   Yes.
9     Q.   And what -- do you recall construction work
10   occurring at the hotel while you were an owner?
11     A.   Yes. We built the hotel.
12     Q.   And did you hire a general contractor to --
13     A.   Yes.
14     Q.   Who did you hire?
15     A.   Maciola.
16     Q.   How do you spell that?
17     A.   I'll have to guess. It's M-a-c-i-o-l-a.
18   Mike, I believe his name was.
19     Q.   And was that the name of the business?
20   What was the name of the business?
21     A.   His construction company? I vaguely
22   remember Maciola Construction.
23     Q.   Are they still in business today?
24     A.   I don't think so.
25     Q.   Do you know where Mr. Maciola is today?

Page 121

1     A.   No.
2     Q.   And while the construction was taking
3   place, did you periodically go to the site to check
4   on the progress of construction?
5     A.   Yes.
6          MS. FISHER: Objection to form.
7     A.   Yes.
8     Q.   Okay. And are you able to provide any
9   details about any construction work that was going on
10   on those occasions when you would be at the site?
11     A.   My main focus at that time was handling the
12   finances and making sure that I got lien waivers from
13   all the subs that he hired before I released any
14   money.
15          So my brother would be more into the
16   progress of the construction phase with the
17   contractor. Mine was more in the paperwork and
18   making sure that I got released of any liens.
19     Q.   Okay. And which brother are you referring
20   to?
21     A.   Bruce.
22     Q.   Okay. So based on your answer, is it -- is
23   it your testimony that you don't recall any of the
24   work going on on the occasions that you -- you
25   visited the construction of the hotel?

Page 122

1        MS. FISHER: Objection to form.
2     A.   I didn't say that.
3     Q.   Okay. Well, what -- what can you tell me
4  about the construction work that was going on on the
5  occasions when you were present on-site?
6     A.   I don't know. There was always a list of
7  what had to be done by a certain date and the monies
8  that had to be available at that time. So I would
9  make sure that they were done as far as checking with
10 my brother and -- and I would walk through the site.
11 But --
12    Q.   On those occasions, what were the -- what
13 were the workers doing?
14    A.   Pilings that went in, framing that was
15 done, appliances that were delivered. I had to make
16 sure that all of the -- the furniture and furnishings
17 were selected and ordered and on time.
18    Q.   Okay. You saw the pilings going in, you
19 saw framing work and then appliances and furnishings.
20       Any other work that you recall during the
21 occasions that you visited the construction of the
22 hotel?
23        MS. FISHER: Objection. Asked and
24 answered.
25    A.   A lot of what I had to do was like dealing

Page 123

1  with the city, the parking lot, the -- you know, the
2  pool inspectors, you know. So I can't think of, you
3  know, other things that I was concentrating on.
4     Q.   Okay. And then in 2000 -- after 2000, what
5  was your next job?
6     A.   I retired.
7     Q.   Okay. And that was for -- your intent at
8  that time was to retire for good; is that right?
9        MS. FISHER: Objection to form.
10    A.   It was, but it didn't turn out that way.
11    Q.   Okay. Well, how did things turn out?
12    A.   My son started up a business, so I had been
13 working for him full time for free. When you're
14 retired, you're considered free.
15    Q.   So how long did you help your son out for?
16    A.   Up until I found out about my condition.
17    Q.   And which son are you -- well, there's only
18 one son.
19    A.   Kim.
20    Q.   And he has --
21    A.   Hudgins Interiors.
22    Q.   And it's sort of an interior -- he does
23 interior flooring type of work; is that right?
24        MS. FISHER: Objection to form.
25    A.   Yes.

Page 124

1     Q.   Okay. And how would you -- in what way did
2  you help your son out?
3     A.   I was his bookkeeper. I helped him out
4  financially. I -- when he had to be off, I had the
5  power to sign the checks.
6     Q.   Okay. And since that time, has your son
7  hired anyone to perform that work?
8        MS. FISHER: Objection to form.
9     A.   He can't afford to.
10    Q.   Now, other than the employment that we've
11 talked about, up until now, during the course of this
12 deposition, do you recall any other employment that
13 you had during the course of your lifetime?
14        MS. FISHER: Objection. Asked and
15 answered.
16    A.   No.
17    Q.   Is your father alive today?
18    A.   I wished he was. I could find out
19 something.
20    Q.   Sure.
21    A.   No, he's not.
22    Q.   Okay. And when did your father pass?
23    A.   I think it was '86 or '87.
24    Q.   And what was the cause of death?
25    A.   Lung cancer.

Page 125

1     Q.   And do you know if that was in any way
2  related to smoking?
3        MS. FISHER: Objection to form.
4     A.   I have no way of knowing.
5     Q.   Okay. Is there -- in your family, is there
6  any other history of cancer that you're aware of?
7        MS. FISHER: Objection to form.
8     A.   No.
9     Q.   So, for instance, your grandparents, are
10 you aware of either of your grandparents having any
11 type of cancer?
12        MS. FISHER: Objection. Asked and
13 answered.
14    A.   No.
15    Q.   The -- your -- your children, what's -- how
16 is Kim's health?
17        MS. FISHER: Objection.
18    A.   Good.
19    Q.   And how is -- how is Todd's health?
20        MS. FISHER: Objection to form.
21    A.   Good.
22    Q.   Do you know if either of them are actively
23 being treated for any medical condition?
24    A.   No, they're not.
25    Q.   Okay. When you were growing up, did your

Page 126

1 father do any -- any vehicle repair work?
2      MS. FISHER: Objection to form.
3  A.  Not that I'm aware of.
4  Q.  Your -- your first husband, Mr. Arehart,
5 did he perform any type of motor vehicle work?
6  A.  No.
7  Q.  And how about your sons, are you aware of
8 your sons performing any motor vehicle work during
9 the time they resided with you?
10  A.  No.
11  Q.  Do you know the names of any -- any people
12 who worked with your father at the -- at the
13 Portsmouth Shipyard?
14  A.  You asked that before, but no.
15  Q.  Okay.  I thought I had asked about your
16 cousins; but, anyway, it doesn't matter.
17  A.  No.  Workers.
18  Q.  In any of the -- well, strike that.
19      At your high school, do you recall any
20 construction work going -- occurring while you
21 attended that high school?
22      MS. FISHER: Objection.  Asked and
23 answered.
24  A.  I don't recall.
25  Q.  And what school did you attend prior to --

Page 127

1 I forget the name of it.  It was "Catholic"
2 something.
3  A.  Norfolk Catholic.
4  Q.  Norfolk Catholic.
5  A.  Oceana.
6  Q.  Was that Oceana Middle School or --
7  A.  It was high school.
8  Q.  Okay.
9  A.  But I only went through the eighth grade.
10  Q.  And do you recall any construction work
11 occurring at the Oceana High School?
12  A.  I can't recall.
13  Q.  Prior to Oceana, what school did you
14 attend?
15  A.  I attended that from the first grade --
16  Q.  Okay.
17  A.  -- to eighth.
18  Q.  I take it you wouldn't remember any
19 construction work that occurred in kindergarten, I
20 take it, or preschool for that matter; is that right?
21      MS. FISHER: Objection to form.
22  A.  I don't recall going to preschool.
23  Q.  Okay.  So the dust on your father's
24 clothing when he worked at the shipyard, is it a fair
25 statement that you don't know if that dust came from

Page 128

1 his work aboard ships versus his work elsewhere at
2 the Norfolk ship -- at the Portsmouth Shipyard?
3      MS. FISHER: Objection to form.
4  Q.  Is that a fair statement?
5  A.  I have no way of knowing.
6  Q.  Okay.  Or whether or not that dust, in
7 fact, came from the shipyard itself.
8      MS. FISHER: Objection to form.
9  Q.  Is that right?
10  A.  I have no way of knowing.
11  Q.  Now, you talked about helping out your son,
12 Kim.  Other than -- other than that work, you did not
13 have any plans to -- to go back into the workforce in
14 the future; is that right?
15      MS. FISHER: Objection to form.
16  A.  No.  I planned to retire and travel, and I
17 did start out traveling.
18  Q.  Okay.  And on your tax returns, there's no
19 one that -- you don't have any dependents on your --
20 on -- that you claim on your tax returns?
21      MS. FISHER: Objection to form.
22  A.  No.
23  Q.  As far as the -- the -- the illness, you've
24 been diagnosed with mesothelioma; is that what the
25 doctors have told you?

Page 129

1  A.  Yes.
2  Q.  Okay.  And can you tell me, are there
3 activities that you can't do now that you're able to
4 do before your diagnosis?
5  A.  Absolutely.
6  Q.  Okay.  And what are -- what are those
7 things?
8  A.  Breathing, sleeping, eating.  Doing things
9 with my family and for them, having other people have
10 to wait on me and drive me places.  So there are just
11 a lot of things that have changed.
12  Q.  Have you had to hire anyone to perform any
13 of those -- any of the functions around your house or
14 anything like that since being diagnosed?
15  A.  I have a landscaper now.  I used to work in
16 the yard all day long, and I can't get out at all.
17 I'm in the process of hiring a housekeeper when I get
18 home because I can't even clean my house.  And then,
19 of course, I depend on my husband to do things that I
20 used to do.
21  Q.  And that's -- is that primarily like work
22 around the house, those types of things?
23      MS. FISHER: Objection.  Form.
24  A.  Going to the grocery store, going to pick
25 up my medicine, taking me to the doctors, taking

Page 130

1 things to my children that I would have done before,
2 taking my grandchildren to places I would have taken
3 them.
4    Q.  Okay.  Prior to the time of your
5 diagnosis — I think I have a list here.
6       Are you okay?  Do you need to take a break?
7    A.  No, I'm fine.
8    Q.  Okay.  Okay.  I'm almost finished.
9       The — I want to make sure I have the —
10 well, strike that.
11       Growing up, who was your family doctor?
12    A.  Oh, golly.  I can't remember his name.  I
13 know he's passed away, but we only went to a doctor
14 when we actually hurt ourselves in those days.
15    Q.  Okay.  Do you recall where his office was
16 located?
17    A.  Somewhere in Oceana.
18    Q.  And —
19    A.  It was in a house.
20    Q.  Do you recall when — when — approximately
21 when did he pass away?
22    A.  Oh, I have no idea.  He was old when —
23 when I went to him.
24    Q.  How — how old were you when you stopped
25 treating with — with this family doctor?

Page 131

1    A.  I don't — I don't know that.
2    Q.  Okay.  Who — who was your next family
3 doctor?
4    A.  I guess when — when I got pregnant was the
5 next doctor.  They weren't necessarily family
6 doctors.  They were just doctors I needed at the
7 time.
8    Q.  Okay.  Do you recall who that doctor was?
9    A.  I think his name was Delora and he was —
10 at that time, he was in Norfolk.
11    Q.  Okay.  What other doctors have you seen
12 other than Dr. Delora and your family doctor growing
13 up?
14       MS. FISHER:  Objection to form.
15    Q.  And you — you don't have to tell me about
16 the doctors you've seen relating to your mesothelioma
17 diagnosis, because I —
18    A.  You have those.
19    Q.  — I — I'll — I have some of those, yes.
20    A.  You mean like an eye doctor or —
21    Q.  No.  A doctor that you treated for a
22 physical condition.  You don't have to tell me about
23 eye doctors.
24    A.  Okay.  I had — I had a tumor removed and
25 that was through the Navy.

Page 132

1    Q.  And —
2    A.  And it was nonmalignant.
3    Q.  When did — when did you have that
4 procedure?
5    A.  I know it's in my medical history.  I want
6 to say — I want to say '89 for some reason.  But you
7 can refer to the medical records for sure.
8    Q.  Yeah.  I don't have them, but —
9    A.  Okay.
10    Q.  The non —
11    A.  It was —
12    Q.  Go ahead.
13    A.  And it was an ovarian cyst.
14    Q.  And following that removal, did you have
15 any follow-up treatment for that other than routine
16 checkups?
17    A.  Just routine.
18    Q.  Okay.  Do you recall who performed that
19 surgery?
20    A.  There were several military doctors, but
21 they all kind of interchanged.  I'm sure my medical
22 records have the actual name.
23    Q.  Okay.  Any other doctors you can recall
24 being treated by other than for the ovarian cyst,
25 Dr. Delora and your family doctor growing up?

Page 133

1       MS. FISHER:  Objection to form.
2    A.  No.  That's the only kind of illness I
3 consider having.
4    Q.  Okay.  And other than the cyst operation
5 and relating to childbirth, have you had any other
6 prior hospitalizations?
7    A.  I had a broken leg when I was young.
8    Q.  Anything else?
9    A.  Nothing — nothing other than what's
10 happened since this year.
11    Q.  Okay.  And so no other surgeries other than
12 what we've already discussed?
13    A.  Right.
14       MS. FISHER:  Objection.  Asked and
15 answered.
16    Q.  And no other emergency room visits other
17 than what we've already discussed?
18    A.  No.
19    Q.  Okay.  I want to ask you about any
20 facilities that you've been to for treatment such as
21 hospitals.  Do you recall — sorry.  I don't think I
22 have a list.
23       What hospitals have you gone to for
24 treatment?  And, again, this is prior to your
25 diagnosis.

Page 134

1        MS. FISHER: Objection. Asked and
2 answered.
3     A.  Okay. Virginia Beach General. It's — now
4 is called Sentara, and that was when I had the cyst.
5 And that's the only hospital I've been to until my
6 condition.
7     Q.  And did you deliver your children in a
8 hospital?
9     A.  DePaul.
10    Q.  Okay. Any other hospitals that you can
11 recall having received treatment at prior to your
12 diagnosis?
13        MS. FISHER: Objection. Asked and
14 answered. Objection. Asked and answered.
15    A.  Not that I recall.
16    Q.  Can you tell me when -- when's the first
17 time you -- you felt a symptom or condition relating
18 to the meso diagnosis that you received?
19    A.  June.
20    Q.  Okay. And what was the -- what was the
21 first symptom you felt?
22    A.  I kept coughing and -- and I went to the
23 doctor for the cough. So that was the first symptom.
24    Q.  Okay. And did — at that time -- and as of
25 June of 2006, did you have any shortness of breath at

Page 135

1 that time?
2     A.  It was more coughing.
3     Q.  Okay. And had you had those coughing type
4 of symptoms -- was there anything different about
5 that cough compared to a normal -- other colds that
6 you had, other coughs that you had?
7     A.  Well, in March of 2006, I was on our
8 vacation in Florida completely healthy, no problems
9 whatsoever. So between March and June, I just
10 started coughing and then went to the doctor when it
11 got to the point where it was starting to hurt me.
12    Q.  Okay. Have you ever had any doctor tell
13 you that your condition was not related to asbestos?
14        MS. FISHER: Objection to form.
15    A.  No.
16    Q.  Okay. I think we're almost done.
17        Through the course of this deposition
18 today, did you testify regarding all of the exposures
19 to asbestos-containing products that you are aware
20 of?
21    A.  Yes.
22        MS. FISHER: Objection to form.
23    Q.  And all of the asbestos-containing products
24 that you believe you were exposed to?
25        MS. FISHER: Objection to form.

Page 136

1     A.  To my knowledge.
2     Q.  And have you identified the manufacturers
3 of -- all of the manufacturers of asbestos-containing
4 products that you believe you were exposed to?
5        MS. FISHER: Objection to form.
6     A.  To my recollection, yes.
7     Q.  And, again, I may have asked you this
8 before, but your father didn't tell you anything
9 about the details of his work, correct?
10        MS. FISHER: Objection. Asked and
11 answered.
12    A.  No.
13    Q.  So he wasn't the type of father who comes
14 home and -- and brings his work home and discusses
15 his work; is that -- is that correct?
16        MS. FISHER: Objection to form. Asked
17 and answered.
18    A.  I guess I didn't pay attention to that at
19 that time. I'm sure he discussed his work, but it
20 wasn't an ongoing sort of a thing.
21    Q.  Okay. But nothing -- well, as you sit here
22 today, can you recall instances where your father
23 would tell you about what he was doing at work?
24        MS. FISHER: Objection to form. Asked
25 and answered.

Page 137

1     A.  I don't recall.
2     Q.  Okay. And do you have any clarifications
3 or modifications or any changes to the testimony
4 you've given so far?
5        MS. FISHER: Objection to form.
6     A.  That's to the best of my knowledge what --
7 what I recollect over the years.
8        MR. STURM: Okay. Thank you,
9 Ms. Anderson.
10       THE WITNESS: Thank you.
11       MR. STURM: Next.
12       MS. FISHER: I think we'll take a
13 quick break. Five minutes okay?
14       MR. STURM: Um-hum.
15          (RECESS.)
16       CROSS-EXAMINATION
17 BY MR. ZIOGAS:
18    Q.  Ms. Anderson, I have a few questions,
19 probably about five minutes' worth.
20    A.  Sure.
21    Q.  If you don't understand anything I'm asking
22 you, please let me know.
23       My name is Bob Ziogas, and I'll be as brief
24 as I can.
25       When you were training for the x-ray

Page 138

1  technician job, was there anytime when other
2  technicians were actually doing the x-rays and you
3  were observing? Did I understand that correctly?
4     A.  Yes.
5     Q.  In the context of you observing that
6  process, was there anytime where you did not wear a
7  protective apron or remain behind the -- the
8  partitions?
9     A.  No.
10         MS. FISHER:  Objection. Form.
11    Q.  Never. And is that also true at any time
12  when you were actually taking the x-rays when you
13  became a technician?
14    A.  That's correct.
15    Q.  Okay. Did you ever see your father smoke
16  during your lifetime or his lifetime?
17         MS. FISHER:  Objection to form.
18    A.  I'm not as sure about my father as I am
19  certain about the rest of my family members --
20    Q.  But --
21    A.  -- so there's a possibility that he did
22  smoke.
23    Q.  But as you sit here today, my question is:
24  Do you remember ever seeing him smoke?
25         MS. FISHER:  Objection. Asked and

Page 139

1  answered.
2         You can answer.
3     A.  I'm trying to think.
4         MS. FISHER:  Yes. I just want to make
5  sure.
6     Q.  You either remember or you don't. And if
7  you don't remember, just -- you can tell me.
8  That's -- that's fine.
9     A.  I really can't say for sure. I want to
10  give you the right answer, but I can't remember that.
11    Q.  Fair enough.
12        Did either of your husbands smoke?
13        MS. FISHER:  Objection. Form.
14    A.  My first husband smoked.
15    Q.  Okay. And what -- did he smoke cigarette,
16  pipe, cigars?
17    A.  Cigarette.
18    Q.  Cigarette.
19        And how many packs per day did he smoke
20  while you were married and living with him, on the
21  average?
22        MS. FISHER:  Objection to form.
23    A.  I don't know how many.
24    Q.  Can you approximate?
25        MS. FISHER:  Objection to form.

Page 140

1     Q.  More than a pack a day?
2     A.  I can't be sure because the majority of the
3  days and evenings, he was not with me.
4     Q.  Now, you say your husband has not smoked?
5         MS. FISHER:  Objection to form.
6     A.  He -- he smokes a cigar occasionally.
7     Q.  And that's all he's ever smoked since
8  you've been married to him?
9     A.  Yes.
10    Q.  And when you say "occasionally," how often
11  would he smoke cigars?
12        MS. FISHER:  Objection to form.
13    A.  Maybe when he walks the dog.
14    Q.  Okay.
15    A.  He doesn't smoke inside.
16    Q.  Never smoked in the house?
17    A.  Never.
18    Q.  Okay. And you mentioned your father had
19  died of lung cancer. Do you know whether he ever
20  made any type of claim for an asbestos-related
21  injury?
22        MS. FISHER:  Objection to form.
23    A.  To my knowledge, he never did.
24    Q.  And no one medical care provider otherwise
25  ever told you what the cause of his lung cancer may

Page 141

1  have been?
2         MS. FISHER:  Objection. Form.
3     A.  No. We didn't know to look for anything
4  else.
5     Q.  Okay. And do you still have that work
6  history in front of you?
7     A.  I don't, but I might remember your asking.
8     Q.  I'll just ask you to look at one page real
9  briefly.
10    A.  Okay.
11        MS. FISHER:  Thank you, David.
12        MR. STURM:  Um-hum.
13    Q.  And it's actually Exhibit A to your
14  father's work history, Ms. Anderson.
15        Do you see Exhibit A which says, "Asbestos
16  used on this job"?
17    A.  This one? Okay.
18    Q.  And I just want to make sure that I
19  understood correctly what you testified to
20  previously. The information on that document did not
21  come from you; is that correct?
22        MS. FISHER:  Objection.
23  Attorney-client privilege.
24    Q.  You can answer.
25        MS. KEYES:  We'll determine whether

Page 142

1 she can answer when we assert a privilege.
2          MS. FISHER: I mean, Mary --
3          MR. ZIOGAS: Well, I'm entitled to
4 know whether she has personal knowledge of this
5 information. That's what I'm --
6          MS. FISHER: And I think it's been
7 covered, and I understand where you're going. I just
8 do not want to get into communications between her
9 and counsel.
10          MR. ZIOGAS: Sure. I didn't ask her
11 what she told her lawyers.
12     Q. Ms. Anderson, do you have personal
13 knowledge of the information that's on that document,
14 Exhibit A?
15          MS. KEYES: There you go.
16          MS. FISHER: That's okay.
17     A. Did I have?
18     Q. Did you have personal knowledge of the
19 information that's on that page?
20     A. No.
21     Q. Okay. And today, do you have any personal
22 knowledge of it?
23     A. No.
24     Q. And you did not create this page?
25     A. No.

Page 143

1     Q. Okay. Have you -- since you learned of
2 your illness, Ms. Anderson, have you personally taken
3 any steps to try to identify any coworkers of your
4 father?
5          MS. FISHER: Object to form.
6          You can answer.
7     A. Yeah. No. That was so long ago, you know,
8 and we lived in a rural area at that time. So, you
9 know, it wasn't like you had neighbors.
10     Q. Okay. But you haven't made any attempts
11 since you learned of your illness to try to locate
12 any coworkers, right?
13     A. No.
14     Q. And have you ever, based on the information
15 you gave today -- I'll try to be brief and I'm going
16 to lead you a little bit -- you've never lived in
17 Richmond personally, the City of Richmond?
18          MS. FISHER: Objection to form.
19     A. No.
20     Q. Have you ever lived in the City of
21 Richmond, Ms. Anderson?
22     A. I just said no.
23     Q. Okay. And have you ever worked in the City
24 of Richmond?
25     A. No.

Page 144

1     Q. And did your father ever work in the City
2 of Richmond, to your knowledge?
3     A. Not to my knowledge.
4     Q. As far as you know, did the -- any
5 coworkers of your father with whom he may have worked
6 around, did they ever work in the City of Richmond?
7          MS. FISHER: Objection. Form.
8     A. I don't know any of them, so...
9     Q. Have -- are any of the medical care
10 providers that you've seen as a result of the illness
11 you claim in this suit been in the City of Richmond?
12 Do they have a practice in the City of Richmond?
13          MS. FISHER: Objection. Form.
14     A. I don't know that answer.
15     Q. All right. You haven't been to the City of
16 Richmond to be treated by any doctor or see any
17 medical care provider?
18     A. No.
19     Q. Okay. Do you have any personal or business
20 contacts in the City of Richmond?
21     A. No.
22     Q. And have you ever had any personal or
23 business contacts in the City of Richmond?
24     A. No.
25          MR. ZIOGAS: That's all the questions

Page 145

1 I have, Ms. Anderson. Thank you.
2          MR. PORETZ: Okay. Ms. Anderson, I
3 guess I'll go next. My name is Jeff Poretz.
4          CROSS-EXAMINATION
5 BY MR. PORETZ:
6     Q. First, let ask you, the original answers to
7 interrogatories that you prepared in this case, they
8 never mentioned any construction work before 1978.
9 Do you recall that?
10          MS. FISHER: Objection. Asked and
11 answered.
12     Q. Do you remember your original answers to
13 interrogatories --
14          MS. FISHER: Objection. Asked and
15 answered.
16     Q. -- that you prepared?
17     A. Yes.
18     Q. In your original answers to
19 interrogatories, you mentioned construction work. Do
20 you recall that?
21     A. Construction maintenance, you know.
22     Q. Fair enough. And -- and we talked about
23 some of that construction and maintenance work today,
24 correct?
25     A. Um-hum.

1   Q.  Is that right?
2   A.  Yeah.  We talked about the construction
3  work.  He mentioned.
4   Q.  And the original answers to interrogatories
5  only mentioned construction work from 1978 to 1985.
6  Do you recall that?
7       MS. KEYES:  Jeff, I'll -- I'll
8  represent that we -- we've since amended that and
9  that was a clerical error and did not accurately
10  reflect the information that Ms. Anderson provided.
11   Q.  Ms. Anderson, you swore to the original
12  answers to interrogatories, correct?
13   A.  Yes.
14   Q.  In your original answers to
15  interrogatories, you -- you mentioned construction
16  work from 1978 until 1985, correct?
17       MS. KEYES:  Jeff, could you put a
18  document in front of her so it's not a memory quiz
19  here?
20       MR. PORETZ:  Sure.  I'll be happy to.
21  Just so the record can reflect that I'm showing you
22  your original answers to interrogatories.
23   Q.  Do you recall this response?
24       MR. COOK:  What -- what's the number
25  for the record, Jeff?  Could you --

1       MS. KEYES:  Five.
2       MR. PORETZ:  It's Interrogatory Answer
3  No. 5.
4       MS. FISHER:  Well, the question starts
5  here (indicating).
6   A.  Okay.  And now what are you questioning
7  here?  The date?
8   Q.  Correct.
9   A.  Okay.  And I -- I'm not sure what you're
10  asking about.
11   Q.  Yeah.  I'm asking you in your original
12  answers, you agreed that the dates you provided where
13  there was construction ongoing from 1978 to 1985, you
14  agreed with that, correct?
15       MS. KEYES:  Objection.  Again, it was
16  a clerical error.  It doesn't represent the
17  information that Ms. Anderson had.
18   A.  The construction or renovation that was
19  done while I worked for civil service was ongoing.
20  It occurred from the time I started civil service,
21  which was in the '60s, and it went on just as an
22  every -- everyday type of occurrence.
23       Now, perhaps the date here, I -- I might
24  have assumed all of these answers were identical, you
25  know.  And so, you know, to me, that is not correct.

1   Q.  So your original answer was inaccurate?
2   A.  No.  My original answer was correct.  That
3  is inaccurate.
4       MS. KEYES:  Which is why we've since
5  amended the -- and provided an amended answer to her
6  Interrogatory No. 5.
7   Q.  By the way, I didn't see any verification
8  to your amended answers.
9       Did you note -- have your amended answers
10  notarized?
11   A.  I don't know.  I've had several notary
12  things to have to sign.  I don't recall.
13   Q.  Now, the Complaint that was filed in this
14  case on your behalf --
15   A.  Um-hum.
16   Q.  -- also doesn't mention any construction or
17  renovation.  Were you aware of that?
18   A.  I thought what we were just reading
19  mentioned --
20   Q.  That was your answer to interrogatory.
21  Have you seen your Complaint, the lawsuit that was
22  filed on your behalf?
23   A.  I think I have.  Yeah.  I've seen so many
24  different documents.
25   Q.  I understand.

1       Are you aware whether or not the Complaint
2  mentions construction work?  One way or the other,
3  are you aware?
4       MS. FISHER:  Objection.  Form.
5   A.  Construction, renovation.  It could be
6  something that's not a major construction going on,
7  so I -- you know, I might not have considered it
8  major construction.  You know, putting up a partition
9  to separate cubicles in rooms --
10   Q.  We're going to get to that in a second.
11   A.  Yeah.
12   Q.  I'm just asking you about the lawsuit that
13  you filed in this case.  Were you aware whether or
14  not the lawsuit alleges some type of exposure to
15  construction work?
16       MS. FISHER:  Objection.  Form.
17   A.  Okay.  At this moment, I'm not aware of,
18  you know, the specific thing you're asking.
19   Q.  Now, you were diagnosed with mesothelioma
20  in 2000 -- summer of 2006, correct?
21       MS. FISHER:  Objection to form.
22   A.  Yes.
23   Q.  And you've been under the care of
24  physicians since then?
25   A.  Yes.

Page 150

1    Q.  And you've always provided your doctor with
2   a complete work history; is that fair to say?
3         MS. FISHER: Objection to form.
4    A.  Doctor with a work history?
5    Q.  Exposure history.
6    A.  When I was diagnosed, they said I had nine
7   months left to live unless I had an operation.  So I
8   just gave him all my medical history.
9         Now, as far as work history, we didn't have
10  time to get into that.
11   Q.  Did he take any -- did he take any type of
12  occupational history?
13        MS. FISHER: Objection.  Asked and
14  answered.
15   Q.  To your recollection?
16   A.  I recall them asking me how I got
17  mesothelioma.
18   Q.  And what did you tell your physicians?
19        MS. FISHER: Objection to form.
20   A.  I have no idea how I got it.
21   Q.  All right.
22   A.  I would like to know.
23   Q.  Did your doctors tell you how they think
24  you got it?
25        MS. FISHER: Objection to form.

Page 151

1    A.  Through inhaling asbestos.
2    Q.  Any particular time period in your life
3   that they think you got it?
4         MS. FISHER: Objection to form.
5    A.  They have no way of knowing any more than I
6   do.
7    Q.  And I assume every time that a physician
8   has asked you for any type of occupational history,
9   you've always given them a full history to the best
10  of your ability; is that fair to say?
11        MS. FISHER: Objection.  Asked and
12  answered.
13   A.  In talking to all my doctors, I have
14  basically concentrated on getting well and I have not
15  discussed any of that type of information with them.
16   Q.  You've always been honest with your
17  physician, though?
18        MS. FISHER: Objection.  Asked and
19  answered.
20   A.  Absolutely.
21   Q.  Now, let me take you back a little bit to
22  some of your work history that we discussed today.
23   A.  Uh-huh.
24   Q.  As I recall your testimony, most of your
25  jobs have been office jobs; is that fair to say?

Page 152

1    A.  Correct.
2         MS. FISHER: Objection to form.
3    Q.  And when we say "office jobs" -- I just
4   want to make clear.  When you say "office jobs," you
5   mean sitting at a desk?
6         MS. FISHER: Objection.  Form.
7    A.  Correct.
8    Q.  Have you had any office jobs where you
9   weren't primarily sitting at a desk?
10   A.  No.
11   Q.  Now, is it fair to say that you have a
12  vague recollection of construction work at various
13  points in time during your work history?
14        MS. FISHER: Objection.  Form.
15   A.  I want to be clear about the terms you're
16  using.  When you say "construction," that includes
17  maintenance and --
18   Q.  I'm sorry.  Thanks for clarifying it.  I do
19  mean maintenance and what you've talked about today.
20   A.  Yeah.  I'm sorry.  Ask that question one
21  more time.
22   Q.  Yeah.  Is it fair to say that you have a
23  vague recollection of construction work, as you just
24  defined it?
25        MS. FISHER: Objection.  Form.

Page 153

1    A.  I remember it as ongoing, so I wasn't
2   paying attention.  I would walk down a hall.  I'd
3   pass workers.  They'd be doing their job.  I recall
4   it happening, but that's all I can tell you.
5    Q.  You can't be specific in terms of the
6   years --
7         MS. FISHER: Objection.
8    Q.  Is that fair to say?
9         MS. FISHER: Objection to form.
10   A.  I have a hard time remembering my birthday
11  right now.  I mean, I really can't.
12   Q.  Do you remember any specific projects?
13   A.  No.  It was always acceptable that it was
14  just a part of the norm, so I didn't pay that much
15  attention to them.
16   Q.  And these were partitions primarily when
17  you were talking about construction earlier today?
18   A.  Yeah.  When they put walls up and make
19  separate offices and things like that.
20   Q.  Any other type of construction that you
21  recall being around?
22        MS. FISHER: Objection.  Asked and
23  answered.
24   A.  No.  Just -- just mainly that type.
25   Q.  Now, would you walk by this construction?

1    A.   Sure.  To get to your offices.
2    Q.   Now, where was your office in the various
3  buildings?  Did you have your own private office or
4  did it depend on the job?
5         MS. FISHER:  Objection.  Form.
6    A.   It depended on the job you had.  It would
7  either be out in the open with a lot of desks and
8  everything was wide open.
9    Q.   And when you worked, you had, I assume, a
10  telephone?
11   A.   Sometimes.
12   Q.   And typewriter?
13   A.   Sometimes.
14   Q.   It looks like you did some -- did you do
15  some financial or budget work for various jobs?
16   A.   Right.
17   Q.   Would there have been a calculator?
18   A.   Yes.
19   Q.   And those would have all been at your desk?
20        MS. FISHER:  Objection.  Form.
21   A.   Yes.  Depending upon the job I had.
22   Q.   How -- how close were you to the
23  construction work from where your various offices
24  were located?
25        MS. FISHER:  Objection.  Form.

1    A.   I mean, it happened everywhere, so I don't
2  know what kind of answer to give you.  And I never
3  paid attention to it.
4    Q.   So you didn't pay close attention to the
5  construction type work that was going on?
6    A.   Only remembering that I would pass it, I
7  would observe it; but that wasn't on my mind for that
8  day.
9    Q.   I assume you never helped out with the
10  construction-related work?
11   A.   No.
12        MS. FISHER:  Objection.  Form.
13   A.   No.
14   Q.   Do you remember any of the names of the
15  construction workers or any of the companies that
16  performed the construction?
17        MS. FISHER:  Objection.  Form.
18   A.   I don't recall.
19   Q.   Now, did you have a private office for any
20  of the various jobs that you held?
21        MS. FISHER:  Objection.  Asked and
22  answered.
23   A.   Yeah.  I -- depending upon the job.
24   Q.   Do you remember what time period -- just a
25  rough time period when you had a private office?

1    A.   That was in the latter part of my work.
2  However, when I had a private office, I was usually a
3  supervisor and had to go out into the open spaces
4  with the employees I supervised.
5    Q.   Do you -- do you remember -- are you
6  associating asbestos-containing products at any of
7  the various construction jobs that --
8         MS. FISHER:  Objection to form.
9    Q.   -- you've testified to today?
10   A.   Well, there were only three names that I
11  could recollect as being familiar to me.  And it was
12  in passing, but that's all I can tell you.
13   Q.   Okay.  What three names?
14   A.   It was the Bondex, the -- give me just a
15  second.
16        MS. FISHER:  Do you need --
17   A.   -- US Gypsum and the Pacific.
18        MS. FISHER:  Are you okay?
19        THE WITNESS:  Yeah.
20        MS. KEYES:  Ms. Anderson, are you
21  okay?
22        THE WITNESS:  Yeah.  I'm okay.
23        MS. KEYES:  Do you want to take a
24  break?  You seem in distress.
25        THE WITNESS:  Yeah.  I'm okay.  I'm

1  just trying to remember so many different pieces of
2  information.
3         MS. FISHER:  Take as much time as you
4  need.
5    A.   But the Bondex and the PBG is what I
6  remembered immediately.
7    Q.   P -- what's the name?
8    A.   PBG?
9    Q.   PBG?
10   A.   Um-hum.
11   Q.   Could it be USG?
12   A.   USG.  I'm sorry.
13   Q.   Was USG the product that you remember
14  seeing the most of the three?
15   A.   No.  I just remember those three as
16  products when I would pass and the workers were
17  either mixing them up or --
18   Q.   Describe what you recall the workers doing.
19   A.   Vaguely, this is what I remember.  In
20  remembering the names, I -- I -- I try to remember
21  from all the names that could possibly be available,
22  what do I recall.  These are the only three that are
23  familiar to me.
24        I recall either powder form, which was then
25  put into either a pail and then mixed.  And on a

Page 158

1  couple of them, I can't tell you whether it was
2  powder form or like a paste already in a container,
3  because usually it ended up in a container to be
4  applied.
5      Q.  Do you remember which one of the three
6  products were -- contained a powder form?
7      A.  No, I can't.
8      Q.  Do you associate any particular product
9  during any particular time period in your work
10  history where these products were used?
11      A.  No.  I just remember during my work period
12  that I remember those names.
13      Q.  And you don't remember any of the workers
14  by name?
15          MS. FISHER:  Objection.  Asked and
16  answered.
17      A.  No.
18      Q.  You don't remember any of the companies
19  that performed the work by name?
20          MS. FISHER:  Objection.  Asked and
21  answered.
22      A.  No.  That wasn't anything I was interested
23  in.
24      Q.  Do you remember any of your coworkers at
25  any of your jobs where these three products were

Page 159

1  used?
2          MS. FISHER:  Objection.  Form.
3      A.  No.  Because if I don't recall where it
4  happened or where I remembered this going on, you
5  know, I can't -- you know, I can't tell you which
6  coworkers, and I have not had any contact with these
7  coworkers for years.
8      Q.  I take it when you walked into the various
9  buildings, you would pass this construction work when
10  it was ongoing, correct?
11          MS. FISHER:  Objection.
12          You can answer.
13      A.  Yeah.  I -- I had to walk past it to
14  observe it.
15      Q.  And then you would go to your desk,
16  correct?
17          MS. FISHER:  Objection.  Asked and
18  answered.
19      A.  Yes.
20      Q.  And in some of your jobs, you had a door,
21  correct?
22          MS. KEYES:  Objection.
23          MS. FISHER:  Objection.  Form.
24      A.  Yeah.  Although I never had the door
25  closed.

Page 160

1      Q.  Do you remember ever having any dust on the
2  calculators or phones or any of the --
3      A.  Well, whenever there was construction or
4  maintenance in this case, there was always dust and
5  dirt.
6      Q.  And you're saying that would get on your
7  phone?
8      A.  I can't remember if it got on my phone.  I
9  just know that they were always cleaning up and
10  sweeping up every time they finished.
11      Q.  Do you remember ever complaining about the
12  construction?
13          MS. FISHER:  Objection.  Form.
14      A.  I never complained, because I never thought
15  anything of it.  I thought it was a part of doing a
16  dirty construction job.
17      Q.  Do you know what the dust -- what the dust
18  was comprised of?
19          MS. FISHER:  Objection to form.
20      Q.  Where it came from?
21      A.  I have no way of knowing that.  I know they
22  sanded the -- the walls before they, you know,
23  painted them.
24      Q.  What do you mean "they sanded the walls"?
25      A.  When they put this mud on the walls.  And

Page 161

1  they would come back and they would sand it before
2  they paint it.
3      Q.  Would they sand the walls the same day that
4  they put the mud on?
5      A.  No.  It had to dry.
6      Q.  So it would dry.  And tell me what you
7  remember the workers doing.
8      A.  I didn't watch them all the time.  I may
9  come in to work at one phase of their operation, go
10  home in another phase.  And I -- I was only
11  interested in getting my job done and getting home.
12      Q.  How long would the various projects take?
13          MS. FISHER:  Objection.  Form.
14      A.  I never paid attention to the length of
15  time.  But, normally, they -- they didn't take a
16  great deal of time just to do that sort of work.
17      Q.  When you say not a great deal of time, you
18  mean a couple of hours, a couple of days, a couple of
19  weeks?
20          MS. FISHER:  Objection to form.
21      A.  No.  It depends upon whether they were
22  putting up partitions or how big a project they were
23  working on.  Some would be minor and, you know, a day
24  or two maybe and, you know, maybe some others took a
25  little longer.

Page 162

1    Q.  Now, would the partitions be made of metal?
2         MS. FISHER: Objection to form.
3    A.  To my knowledge, they were made of wood,
4  like two-by-fours.
5    Q.  Other than partitions, do you remember any
6  other type of construction work?
7         MS. FISHER: Objection. Form.
8    A.  Not that I recall.
9    Q.  And you were at the Fifth Naval District
10  Headquarters, I think you said, as a temporary job;
11  is that correct?
12    A.  Yes.
13    Q.  And I think you said -- I forget the
14  months -- was it about six months or so?
15    A.  I think that was probably --
16    Q.  Roughly?
17    A.  Roughly, six to nine months.
18    Q.  And you don't recall any specific
19  construction at that job, correct?
20         MS. FISHER: Objection. Asked and
21  answered.
22    A.  I honestly can't -- can't say because I
23  never paid attention to these things going on.
24    Q.  How large of a building was that?
25    A.  It was a rather large building. It was a

Page 163

1  headquarters building.
2    Q.  And do you remember where your office was
3  in that building?
4         MS. FISHER: Objection. Form.
5    A.  Probably the center of the building.
6    Q.  You don't remember what floor?
7    A.  No.
8    Q.  Now, at the Oceana job, was that also a
9  large building?
10    A.  The operator one was in the headquarters
11  building.
12    Q.  Also large?
13    A.  Yes.
14    Q.  And do you remember what floor you were on
15  in that?
16    A.  It was a two-story building. I want to say
17  I was on the first floor.
18    Q.  And the Dam Neck training building, was
19  that a large building?
20         MS. FISHER: Objection. Form.
21    A.  It wasn't real large; but it was, you know,
22  a good-sized building.
23    Q.  And do you remember what floor you were on
24  in that building?
25    A.  That only had one floor.

Page 164

1    Q.  The same with the public health building --
2  hospital, rather; is that a large hospital?
3         MS. FISHER: Objection. Form.
4    A.  Back then. Compared to hospitals today, I
5  would say that that was a pretty good size. It was
6  very, very old. It was mainly for the Coast Guard
7  and things like that.
8    Q.  When this construction work was ongoing,
9  would -- would they open up the windows to ventilate?
10         MS. FISHER: Objection. Form.
11    A.  I never paid attention to it.
12    Q.  So you don't know one way or the other?
13    A.  No, I don't.
14         MS. FISHER: Objection. Form.
15    Q.  What were your hours at the various jobs?
16  Were they consistently the same?
17         MS. FISHER: Objection. Form.
18    A.  Usually they were the same; 7:00 to 3:00,
19  8:00 to 4:00.
20    Q.  Do you remember what time the construction
21  workers would work various jobs?
22         MS. FISHER: Objection to form.
23    A.  Normally -- normally the same hours.
24    Q.  Would you eat at your desk?
25    A.  Yes.

Page 165

1    Q.  Is that a yes?
2    A.  Yes.
3    Q.  Your earlier time -- your earlier part of
4  your work history, were the windows open throughout
5  the buildings in the summertime?
6         MS. FISHER: Objection. Form.
7    A.  No.
8    Q.  Was there A/C?
9         MS. FISHER: Objection.
10    Q.  A/C, air conditioning?
11    A.  Yes. Yes.
12    Q.  Now, can you describe the packaging on the
13  various types of -- I think you've called it mud. Do
14  you remember the size of the various products or
15  packages?
16         MS. FISHER: Objection. Form.
17    A.  I don't recall the size. I recall bags or
18  boxes and also buckets. Now, whether those buckets
19  were a result of the bags or the boxes being put into
20  the buckets, I couldn't tell you.
21    Q.  Do you remember the -- the color of the
22  buckets?
23         MS. FISHER: Objection. Form.
24    A.  It just seems to me like plastic buckets.
25         (MR. ZIOGAS EXITS THE CONFERENCE ROOM.)

1    Q.  Yeah.  But do you remember the color of the
2  buckets?
3    A.  No.
4        MS. FISHER:  Objection.  Asked and
5  answered.
6    Q.  Do you remember any lettering on the
7  package or the buckets, rather?
8        MS. FISHER:  Objection.  Form.
9    A.  In identifying the three items that are
10  familiar to me, I can't honestly say one was in a
11  bag, a bucket or a box.  Eventually, they all ended
12  up in a bucket and were mixed if they were powders.
13    Q.  Do you believe that these three products
14  contained asbestos?
15        MS. FISHER:  Objection.  Form.
16    A.  It's hard for me to say.  But this is the
17  only thing that I can come up with that could
18  possibly have caused my problem.  I've always worked
19  all my life and it's always been in these jobs.  I
20  haven't had any reason at home to have this problem.
21    Q.  You haven't worked personally with any of
22  these products?
23        MS. FISHER:  Objection.  Form.
24    Q.  Correct?
25    A.  Correct.

1    Q.  Other than your lawyers, has anybody ever
2  told you that these products contained asbestos?
3        MS. FISHER:  Objection.  Form.
4    A.  No one has ever had a reason to talk to me
5  about the product until I was diagnosed.
6    Q.  Have you told your doctors that you were
7  around these products?
8        MS. FISHER:  Objection to form.
9    A.  As I said before, I did not get into the
10  specific work area, except they asked me what could
11  have caused your problem.  I said, the only thing
12  would have been my father and my work history.
13    Q.  You told your physicians?
14    A.  Yes.
15    Q.  And you told your physicians your work
16  history may have been part of the cause?
17        MS. FISHER:  Objection.  Asked and
18  answered.
19    A.  Absolutely.  They are the only — only two
20  areas.
21    Q.  Did you identify these three products to
22  your physicians?
23        MS. FISHER:  Objection.  Form.
24    A.  We didn't get into that.  We got into the,
25  how long you're going to live and you got to have an

1  operation right away, and that was more important to
2  me than worrying about what caused it.
3    Q.  In the various construction jobs, were
4  there any other asbestos-containing products, other
5  than the three that you mentioned today, that you
6  were around that you can think of?
7        MS. FISHER:  Objection.  Form.
8    A.  These are the only three that I can
9  recollect.  And I did a lot of recollecting, because
10  I didn't want to come up with a name that wasn't
11  familiar to me.
12    Q.  I understand you would not spend a lot of
13  time observing the construction workers doing their
14  job; is that fair to say?
15        MS. FISHER:  Objection.  Form.
16    A.  Correct.
17    Q.  Could you describe the sanding process to
18  me?  Did you observe that?
19        MS. FISHER:  Objection.  Asked and
20  answered.
21    A.  I would -- I would see sanding and it would
22  either be done with a hand -- like a hand trowel or
23  on a pole if it was high up.  And it would create
24  dust or whatever or mess.
25    Q.  Did they use tape?

1    A.  Use tape for...
2    Q.  Any of the sanding, before the sanding,
3  after the sanding?
4        MS. FISHER:  Objection.  Objection to
5  form.
6    A.  I don't recall.  I just remember the -- the
7  part where they -- where they used the mud.  I had --
8  I recall seeing a roll of tape about so big
9  (indicating) about six inches or four inches; but I
10  wasn't aware of if that went on the wall or not.
11    Q.  Do you remember any of your — any of your
12  coworkers at the Fifth Naval District?
13        MS. FISHER:  Objection.  Asked and
14  answered.
15    (MR. BURNS EXITS THE CONFERENCE ROOM.)
16    A.  No.  That's 40, 50 years ago.
17    Q.  I know.  Do you remember any coworkers at
18  Oceana?
19        MS. FISHER:  Objection.  Asked and
20  answered.
21    A.  No.  The ones I remember passed on.
22    Q.  How about at Dam Neck training?
23        MS. FISHER:  Objection.  Asked and
24  answered.
25    A.  I remember them, but they were military and

Page 170

1  they moved, so I have no idea, you know.
2    Q.  Do you recall any of their names even
3  though they've moved?
4        MS. FISHER:  Objection.  Asked and
5  answered.
6    (MR. BURNS ENTERS THE CONFERENCE ROOM.)
7    A.  I really don't.
8    Q.  The same question for the Public Health
9  Hospital.
10        MS. FISHER:  Objection.  Asked and
11  answered.
12    A.  No.  I had a supervisor and she's passed
13  on, so I don't.
14    (MR. ZIOGAS ENTERS THE CONFERENCE ROOM.)
15    Q.  How about at the Naval Air Station?
16        MS. FISHER:  Objection.  Asked and
17  answered.
18    A.  No, I don't.
19    Q.  Human Resource Management Center?
20        MS. FISHER:  Objection.  Asked and
21  answered.
22    A.  No.
23    Q.  CINT?
24        MS. FISHER:  Objection.  Asked and
25  answered?

Page 171

1    A.  No.
2    Q.  Do you recall any coworkers at the naval
3  station?
4    A.  No.
5    Q.  How about at the Atlantic Fleet
6  Headquarters?
7        MS. FISHER:  Objection.  Asked and
8  answered.
9    A.  I remember the commander I worked for.
10    Q.  Okay.  Who was that?
11    A.  His name is Hershburger, but that's all I
12  remember about him.
13    Q.  Do you know how to spell that?
14    A.  H-e-r-s-h-b-u-r-g-e-r, I believe.
15    Q.  Do you know if he's still alive?
16    A.  I doubt it.  He was -- he would be in his
17  80's or, you know, if he is alive.  And he was a heavy
18  smoker and drinker.
19    Q.  Civil service?
20        MS. FISHER:  Objection.  Asked and
21  answered.
22    A.  Military.
23    Q.  No.  I'm sorry.
24        You worked at -- in civil service in the
25  District of Columbia --

Page 172

1    A.  Yes.
2    Q.  -- from approximately '80 to '85?
3    A.  Yes.
4    Q.  Any coworkers that you recall from that
5  time period?
6        MS. FISHER:  Objection.  Asked and
7  answered.
8    A.  No.  There was a lot of turnover with civil
9  service.  Every time a promotion came up, you would
10  move on to another place to get a higher grade.  And
11  so, you know, there weren't a lot of...
12    Q.  So from 1960 until about 1985, the only
13  name that you recall is Adam Hershburger?
14        MS. FISHER:  Objection.  Asked and
15  answered.
16    A.  Commander Hershburger.
17    Q.  Commander Hershburger.  I'm sorry.
18    A.  That's the only one I remember clearly.
19    Q.  And you remember these three products?
20    A.  Yes.
21        MR. PORETZ:  That's all I have.  Thank
22  you.
23        THE WITNESS:  Okay.
24        MS. KEYES:  We have about 15 more
25  minutes.

Page 173

1        MR. NASEEM:  One quick question.
2        CROSS-EXAMINATION
3  BY MR. NASEEM:
4    Q.  Ms. Anderson, good afternoon.  I just have
5  one quick question.
6        Have you been vaccinated for polio or do
7  you know if you've been vaccinated for polio?
8    A.  I believe I have been.
9    Q.  Do you know when you were vaccinated?
10    A.  Oh, golly.  When I was very young.
11    Q.  Very young?
12    A.  Yeah.
13    Q.  Do you think shortly after you were born
14  or --
15    A.  This reminds me (indicating) of getting --
16  getting the polio vaccine.
17    Q.  Okay.  So but would it be fair to say
18  before 1950?
19        MS. FISHER:  Objection.  Form.
20    A.  I would say so.
21        MR. NASEEM:  Thank you very much.
22        MR. BURNS:  I have a few questions;
23  but do you want to go, Josh, or --
24        MR. BENNETT:  You can -- you just go.
25        MS. FISHER:  How long do you think you

Page 174

1  guys have?
2        MR. COOK: Hopefully, three minutes
3  for my questions.
4        MS. FISHER: Okay.
5        MR. BENNETT: Mine won't be much more
6  than that.
7        MS. FISHER: Are you -- are you okay?
8        THE WITNESS: I'm fine. I'm fine, as
9  long as I can --
10        MR. STURM: We -- we might finish
11  today.
12        MS. KEYES: Okay. I'll have -- we're
13  going to have some examination. Okay.
14        CROSS-EXAMINATION
15  BY MR. COOK:
16    Q. Ma'am, you had mentioned some travel that
17  you did.
18    A. Yes.
19    Q. And I was just curious what countries
20  you've traveled to.
21    A. When my husband was in NATO --
22    Q. Um-hum.
23    A. -- we traveled all of Europe.
24    Q. Have you ever been to Greece?
25    A. No.

Page 175

1    Q. Turkey?
2    A. No.
3    Q. Depending on the time period; Bosnia,
4  Yugoslavia?
5    A. No.
6    Q. What other -- what European countries have
7  you been to?
8    A. England, France, Belgium, Spain, Germany.
9  And I'm sure there are plenty of others I've been to.
10  I just -- but those did not ring a bell, the ones you
11  mentioned.
12    Q. Okay. I would like to talk -- I have a few
13  questions for you with respect to the construction
14  work that you remember.
15    A. Um-hum.
16    Q. And is it correct for the three names that
17  you associate with construction work that one product
18  may have been at one site and another product may
19  have been at a different site?
20        MS. FISHER: Objection to form.
21    A. I remember those names, but I do not
22  remember which one was where.
23    Q. Okay. And you also can't say that there
24  would be two or three of those product names at the
25  same given site?

Page 176

1        MS. FISHER: Objection. Form.
2    Q. Is that correct?
3    A. To my recollection, there would only be one
4  specific one at the specific site.
5    Q. Okay. Can you tell me a -- I think I know
6  the answer, but I have to ask the question anyway.
7        Can you tell me a specific year or years
8  that you would have observed a particular product at
9  one of these construction sites?
10        MS. FISHER: Objection. Asked and
11  answered.
12    A. It was an ongoing process. I have no time
13  period for any -- any of them.
14        MR. COOK: I think that's all the
15  questions I have then. Thank you, ma'am.
16        THE WITNESS: Okay.
17        MR. BENNETT: Ma'am, my name is Josh
18  Bennett. I'm from Winston-Salem. I've just got a
19  few questions about the construction work again.
20        THE WITNESS: Sure.
21        CROSS-EXAMINATION
22  BY MR. BENNETT:
23    Q. In answering some other attorneys'
24  questions about the construction work and the
25  products that you associated with that, you -- you

Page 177

1  said that you recollect and you -- you remember three
2  certain names, one of them being Bondex.
3        What is it that you remember about -- what
4  is it about Bondex that makes that word pop into your
5  head?
6        MS. FISHER: Objection to form.
7    A. It's just an easy name to remember. If
8  given anything about the different products, the
9  Bondex to me appeared to be more in a powder form
10  than in a paste or liquid -- you know, a paste form.
11  That's all I can remember about Bondex. Just the
12  name and trying to remember, you know, anything else
13  about it.
14    Q. Well, where -- where did you get that name?
15        MS. FISHER: Objection. Form.
16    A. Where did I get it?
17    Q. Yes, ma'am?
18    A. (Witness gestures.)
19    Q. Well, all right. Let me -- let me --
20        MS. KEYES: Let -- let the record
21  reflect that the witness pointed to her head.
22        THE WITNESS: I'm sorry.
23    A. I was asked to try to recollect over my
24  work history what possible names that I could
25  remember, and any type of, you know, construction

Page 178

1  work like this.
2      Q.  Well, I think I can get a little more
3  specific about what I'm trying to get at.
4      A.  Okay.
5      Q.  If you -- and just as background to this
6  question, if you were to ask me, do you remember
7  working with or around a Microsoft product --
·8      A.  Um-hum.
9      Q.  -- I'd say I remember it, and the reason I
10 remember it is because every time I turn on my
11 computer, I see the word "Microsoft" pop up.
12         So what memories do you have of Bondex
13 products that makes you think that you were around
14 them?
15         MS. FISHER: Objection. Form.
16     A.  Everybody has a different memory. I have
17 phases, I can remember when I was 2 years old being
18 in a hospital in a car wreck. So that -- for some
19 reason, I don't remember other things after that.
20 But when I tried to recollect names, those were the
21 names that were familiar to me.
22     Q.  Have you ever been -- before, say, 1980,
23 did you ever go into a hardware store?
24         MS. FISHER: Objection. Form.
25     A.  Before 1980. I probably did.

Page 179

1      Q.  From the answers you've given, I think I
2  know the answer to most of these questions, so I'm
3  going to tighten it up.
4         But I'm assuming you can't tell me what
5  type of -- what specific type of packaging the Bondex
6  product you remember came in.
7         MS. FISHER: Objection. Form, asked
8  and answered.
9      A.  Well, I had answered that a minute ago. I
10 basically said, to my knowledge, that's the only one
11 that stands out that could have possibly been in a
12 powder form, either a bag or a box.
13     Q.  And you did answer that and I asked it
14 wrong.
15         What -- what -- what was that powder
16 encased in? What did it -- was it a bag or a box or
17 a tub or a --
18         MS. FISHER: Objection. Form, asked
19 and answered.
20     A.  What I was saying is that, to my knowledge,
21 it was in a bag or a box. Now, it may have ended up
22 in a tub after being prepared. But that's the only
23 one of the three that I remember being in a powder
24 form, you know, more clearly than the other two.
25     Q.  Do you remember -- do you remember what the

Page 180

1  color of that bag or box was?
2         MS. FISHER: Objection. Form, asked
3  and answered.
4      A.  Only the powder.
5      Q.  You only remember the color of the powder,
6  not the bag or the box?
7      A.  Right.
8      Q.  Do you -- so you don't remember the color
9  of the words printed on that bag or box?
10         MS. FISHER: Objection. Asked and
11 answered.
12     A.  No.
13     Q.  Okay. And you don't remember the font of
14 any of the letters printed on the bag or box?
15         MS. FISHER: Objection. Asked and
16 answered.
17     A.  No, I don't.
18     Q.  Do you remember if there was anything else
19 written on those bags or boxes?
20         MS. FISHER: Objection. Asked and
21 answered.
22     A.  As I say, that wasn't my -- my real focus.
23     Q.  It's fair to say when this work was going
24 on, this wasn't work that you would go stand around
25 and watch happen, was it?

Page 181

1         MS. FISHER: Objection to form. Asked
2  and answered.
3      A.  I have no idea. If it was close by and you
4  saw workers doing something and you took a lunch
5  break or a break, you might have passed by and spoke
6  to them. So, you know, I can't tell you anything
7  more than that.
8      Q.  On your work history sheets that were, I
9  think, Exhibit A -- can you pull those up real quick?
10         On Exhibits B through, I believe, G, of the
11 work history sheets, specifically there's the word
12 "Bondex" and then there's a -- an X under the word --
13 under the words "worked with." You've never worked
14 on Bondex -- worked with Bondex, have you?
15         MS. FISHER: Objection to form.
16     A.  No. I just thought this meant worked with
17 it or around it.
18     Q.  Did the workers who were doing the
19 construction, did they wear masks or respiratory
20 equipment?
21         MS. FISHER: Objection to form.
22     A.  I don't recollect.
23         MR. BENNETT: I think that's all I
24 have. Thank you, Ms. Anderson.
25         MS. FISHER: Okay.

Page 182

1    MS. KEYES: What time do we have?
2    MR. RAINSFORD: I've got -- can I get
3 in four quick questions?
4    MS. KEYES: If you can get them in in
5 five minutes, go for it.
6    MR. RAINSFORD: I think I can. They
7 are not terribly open-ended questions.
8    MS. FISHER: Can you go five more
9 minutes?
10    THE WITNESS: Yeah. Yeah.
11    CROSS-EXAMINATION
12 BY MR. RAINSFORD:
13    Q. Ms. Anderson, good afternoon. My name is
14 Todd Rainsford. It's a pleasure seeing you here
15 today.
16    A. Um-hum.
17    Q. I was wondering, we've asked this question
18 about your first husband, your father and your sons;
19 but I was wondering if your second husband, Andy,
20 ever did any car repair work at all.
21    A. No.
22    Q. Okay. Going to the construction work that
23 you saw done, do you recall the color of the mud you
24 claim to have seen at various job sites?
25    A. When they applied it on the walls, it was

Page 183

1 white.
2    Q. And when they applied the mud, was it sort
3 of wet and glistening-looking material or --
4    MS. FISHER: Objection to form.
5    A. Well, I don't know if you call it
6 "glistening." It was wet mud until it dried.
7    Q. The construction workers who did some of
8 this work, did you see construction workers working
9 both inside and outside the buildings?
10    A. Only on the inside.
11    Q. So you never saw any construction done on
12 the outside of any of the buildings you worked in?
13    MS. FISHER: Objection. Asked and
14 answered.
15    A. No.
16    Q. And the construction workers you saw
17 working inside with this mud, would they sort of
18 cordon themselves off, put some sort of cloths or
19 plastic sheets or anything like that to put some
20 distance between themselves and other people working
21 in the building?
22    MS. FISHER: Objection. Form.
23    A. I don't recall. I know back in the old
24 days, you know, things were done a lot different than
25 maybe the way they do them today; but I really don't

Page 184

1 recall.
2    Q. I was also wondering with regard to the
3 time period you worked from 1962 to 1980, you said
4 you didn't recall any of your coworkers from that
5 time period. Did you make friends with anyone that
6 you worked with at that time and have kept in touch
7 with any of those people?
8    MS. FISHER: Objection. Form.
9    A. No.
10    MR. RAINSFORD: That's all I have.
11 Thank you, ma'am. I appreciate it.
12    THE WITNESS: Okay.
13    MS. KEYES: Okay. I think it's --
14 it's 2:35. I don't know who else has questions, but
15 we can just resume tomorrow at 10:00.
16    MR. STURM: Okay.
17    MS. KEYES: Okay. And Ms. Anderson
18 has a similar treatment schedule tomorrow that will
19 require her to leave at approximately 2:30. But I
20 think we can get it done, including the video,
21 tomorrow; which, you know, will be good for all of
22 us, I think.
23    MR. STURM: We can go off the record.
24    (DEPOSITION ADJOURNED AT 2:29 P.M. TO RESUME AT
25    10:00 A.M., JANUARY 11, 2007.)

Page 185

1 STATE OF NORTH CAROLINA    )
   SS:
2 COUNTY OF WAKE    )    VOLUME 1
3
4    I, BARBARA ANNE ANDERSON, declare under
5 penalties of perjury under the State of North Carolina
6 that the foregoing is true and correct.
7    Executed on this _____ day of
8 _____, 2007, at _____, North
9 Carolina.
10
11
12    _____
13    BARBARA ANNE ANDERSON
14
15 This deposition was signed in my presence by
16 _____, on the _____ day of
17 _____, 2007.
18
19
20
21
22    _____
         Notary Public
23 My Commission expires:
24
25

Page 186

1        TRANSCRIPTION CORRECTIONS
2   CASE NAME: BARBARA ANNE ANDERSON v. ALFA LAVAL, INC.,
    et al.
3   CASE NO.: 760CL06006790-00
    WITNESS NAME: BARBARA ANNE ANDERSON - VOLUME I
4   DATE: _____
5   PAGE  LINE   READS      SHOULD READ
6   ____|____|_____|_____
7   ____|____|_____|_____
8   ____|____|_____|_____
9   ____|____|_____|_____
10  ____|____|_____|_____
11  ____|____|_____|_____
12  ____|____|_____|_____
13  ____|____|_____|_____
14  ____|____|_____|_____
15  ____|____|_____|_____
16  ____|____|_____|_____
17  ____|____|_____|_____
18  ____|____|_____|_____
19  ____|____|_____|_____
20  ____|____|_____|_____
21  ____|____|_____|_____
22  ____|____|_____|_____
23  ____|____|_____|_____
24  ____|____|_____|_____
25  ____|____|_____|_____

Page 187

1         C E R T I F I C A T E
2         I, RANAE McDERMOTT, RMR, CRR, a Notary Public
3   in and for the State of North Carolina, do hereby
4   certify that there came before me on January 10, 2007,
5   the person hereinbefore named, who had been previously
6   sworn to testify to the truth and nothing but the truth
7   of his knowledge concerning the matters in controversy
8   in this cause; that the witness was thereupon examined
9   under oath, the examination reduced to typewriting
10  under my direction; and the transcript is a true record
11  of the testimony given by the witness.
12        I further certify that I am neither attorney
13  or counsel for nor related to or employed by, any
14  attorney or counsel employed by the parties hereto or
15  financially interested in the action.
16        This the 20th day of January, 2007.
17
18  _____
        RANAE McDERMOTT, NOTARY PUBLIC
19      Notary No. 1997112018
20
21
22
23
24
25